A 91
Rev. 11/97

# CRIMINAL COMPLAINT

COPY

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>LUIS MANUEL TAPIA,<br>DIANA SOPHIA ZAMORA,<br>EDGAR RAFAEL AGUILAR,<br>ROGER GONZALES ARMENDARIZ,<br>JAIME CARDENAS, and<br>FIRST NAME UNKNOWN LAST NAME UNKNOWN aka "PANCHO" | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>11-<br>11 2495M |

**Complaint for violation of Title 21, United States Code Sections 846, 841 (A)(1)**
**And Title 18, United States Code Sections 371, 922 (a)(1)(A)**

| NAME OF MAGISTRATE JUDGE<br><br>CARLA WOEHRLE | UNITED STATES MAGISTRATE JUDGE | LOCATION<br><br>Oxanrd, CA |
|---|---|---|

| DATE OF OFFENSE<br>Beginning on date unknown to on or about October 24, 2011 | PLACE OF OFFENSE<br>Ventura County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Please see attachment.

FILED
CLERK U.S. DISTRICT COURT
AUG 2 4 2011
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br><br>RICHARD MARQUEZ JR. |
|---|---|
| | OFFICIAL TITLE<br>**OFFICER - Ventura County Regional Interagency Anti-Crime Task Force** |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE<br><br>CARLA WOEHRLE          CARLA M. WOEHRLE | DATE<br><br>October 24, 2011 |
|---|---|

AUSA:M.JENKINS:gf          REC: Detention and Arrest Warrant

ATTACHMENT TO COMPLAINT

COUNT 1  [21 U.S.C. § 846)]

Beginning on a date unknown, and continuing to on or about October 24, 2011, in Ventura County, within the Central District of California, and elsewhere, defendants LUIS MANUEL TAPIA, DIANA SOPHIA ZAMORA, EDGAR RAFAEL AGUILAR, ROGER GONZALES ARMENDARIZ, JAIME CARDENAS, and "PANCHO," and others known and unknown, conspired and agreed with each other to knowingly and intentionally (a) possess with intent to distribute and (b) distribute at least 50 grams of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(b)(1)(A)(viii)

COUNT 2 [18 U.S.C. § 371]

Beginning on an unknown date, and continuing until on or about October 24, 2011, in Los Angeles County, within the Central District of California, and elsewhere, defendants LUIS MANUEL TAPIA, DIANA SOPHIA ZAMORA, EDGAR RAFAEL AGUILAR, ROGER GONZALES ARMENDARIZ, JAIME CARDENAS, and "PANCHO," and others known, conspired and agreed with each other to knowingly and intentionally engage in the business of dealing in firearms without a license, in violation of Title 18, United States Code, Section 922(a)(1)(A).

<u>**A F F I D A V I T**</u>

I, Richard Marquez Jr., being duly sworn, hereby depose and say as follows:

<u>**RELEVANT TRAINING AND EXPERIENCE**</u>

1.    I am a police officer for the City of Oxnard, California.  I have been employed with the Oxnard Police Department ("OPD") since July 8, 2002.  I am currently assigned to the Ventura County Regional Interagency Anti-Crime Task Force ("VC-RIACT"), which is a federal task force responsible for investigating violent gangs within Ventura County.  As an investigator with the VC-RIACT, I have received Special Deputation by the Federal Bureau of Investigation ("FBI"), pursuant to Title 21 as well as Special Deputation by the United States Marshal's Office pursuant to Title 18.  As such, I am authorized by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  Prior to my current assignment, I was assigned to the Oxnard Police Department's Special Enforcement Unit ("SEU") where I maintained that position for approximately five (5) years.

2.    In the course of my employment with the OPD, I have participated in the arrests of more than 100 persons for firearms, drug related and/or violent offenses, and have

1

assisted in the preparation and execution of over 50 search and arrest warrants for firearms, narcotics and violent crime offenses.  My current job assignment includes investigations involving:  possession with the intent to distribute and distribution of controlled substances, and conspiracies associated with the foregoing criminal offenses, which are prohibited by Title 21, United States Code, Sections 841(a)(1) and 846; Violent Crimes In Aid Of Racketeering ("VICAR"), which are prohibited by Title 18, United States Code, Section 1959; and Racketeer Influenced and Corrupt Organizations ("RICO") and RICO Conspiracy, which are prohibited by Title 18, United States Code, Sections 1961 and 1962.

3.    I have participated in numerous aspects of criminal street gang investigations, including the interception of wire communications, physical surveillance, and utilization of confidential informants, consensually monitored telephone conversations, the execution of search warrants, and the arrest of criminal street gang members.  I have spoken with defendants, confidential informants, and witnesses who have extensive knowledge of the inner workings of criminal street gangs.  I have also spoken with experienced gang and narcotics investigators concerning the methods and practices of criminal street gang members who are engaged in murder, attempted murder,

2

extortion, assault with a deadly weapon, and narcotics trafficking.

4.    In addition, through my investigations, my training and experience, and my discussions with other law enforcement personnel, I have become familiar with the tactics and methods used by controlled substance traffickers to smuggle and safeguard controlled substances, to distribute controlled substances, to collect and launder the proceeds from the sale of controlled substances, and the clandestine manufacturing of narcotics.  These tactics and methods include using cellular telephones, using cloned communication devices, using digital display paging devices, using debit calling cards, using public pay telephones, using counter surveillance techniques, using false or fictitious identities, and using coded communications and coded words in conversations.

5.    The task force to which I am currently assigned consists of experienced special agents and gang and narcotics investigators and includes representatives from the FBI, OPD, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and California Department of Corrections and Rehabilitation ("CDCR").

## PURPOSE OF AFFIDAVIT

6.    This affidavit is intended to show that there is

3

sufficient probable cause for the requested complaint, arrest warrants, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. The statements set forth in this affidavit are based upon my training, education and experience, consultation with experienced law enforcement officers and agents, and other reliable sources of information relative to this investigation.

A.    **Arrest Warrants for Target Subjects**

7.   This affidavit is made in support of a criminal complaint and arrest warrants charging the below-named Target Subjects with a violation of Title 21, United States Code, Sections 846, 841(a)(1), 841(b)(1)(A)(viii): conspiracy to distribute and to possess with the intent to distribute at least 50 grams of methamphetamine and Title 18, United States Code, Sections 371, 922(a)(1)(A): conspiracy to and willfully engaging in the business of dealing firearms without a dealer license:

(a)    LUIS MANUEL TAPIA (b.1976) ("**TAPIA**"): I identified **TAPIA** based on a comparison of his OPD booking photograph to my surveillance observations during this investigation. From my review of law enforcement databases, **TAPIA** has a criminal history that includes convictions for unlawful taking of a vehicle, transport/sale of controlled substance, possession of controlled substance for sale and

4

obstruction/resisting a police officer. I also reviewed **TAPIA**'s parole records, **TAPIA** was found in violation of his parole terms on charges of attempt murder, possession of a firearm and gang association. **TAPIA** is a documented member of the Colonia Chiques criminal street gang (the "COCH gang") with a gang monikers of "Taps" and "LT." **TAPIA** is also a documented Mexican Mafia associate.

(b)    DIANA SOPHIA ZAMORA (b.1988) ("**ZAMORA**"): I identified **ZAMORA** based on a comparison of her OPD booking photograph to my surveillance observations during this investigation. ZAMORA is a documented associate of the Colonia Chiques criminal street gang.

(c)    EDGAR RAFAEL AGUILAR (b.1982) ("**AGUILAR**"): I identified **AGUILAR** based on a comparison of his OPD booking photo to my surveillance observations during this investigation. From my review of law enforcement databases, **AGUILAR** has a criminal history that includes convictions for carrying a loaded firearm, destroying or concealing documentary evidence, being under the influence of a controlled substance, possession of ammunition by a prohibited person, and flight from a pursuing officer. **AGUILAR** has also been convicted twice for obstructing/resisting a police officer, twice for violation of a criminal street gang injunction and seven convictions for

disobeying a court order. **AGUILAR** is a documented member of the COCH gang and has a gang moniker of "Lil Silent." **AGUILAR** has been served with the COCH gang injunction and is currently on probation.

(d)   ROGER GONZALES ARMENDARIZ (b.1976) ("**ARMENDARIZ**"):   I identified **ARMENDARIZ** based on a comparison of his OPD booking photo to my surveillance observations during this investigation. From my review of law enforcement databases, **ARMENDARIZ** has a criminal history that includes convictions for burglary, possession of a controlled substance, obstructing/resisting a police officer and driving with a suspended license.

(e)   JAIME CARDENAS (b.1992) ("**CARDENAS**"): I identified **CARDENAS** based on a comparison of his OPD booking photo to my surveillance observations during this investigation. From my review of law enforcement databases, **CARDENAS** has a criminal history that includes juvenile sustained petitions for assault with a deadly weapon on a peace officer, driving under the influence and causing bodily injury to another person, obstructing/resisting a police officer, theft, removal of an electronic monitor, battery, fighting in a public place, and five convictions for disobeying a court order. **CARDENAS** is also a documented member of the COCH gang and has a gang moniker of

6

"Terco." **CARDENAS** has been served with the COCH gang injunction and is currently on probation.

(f) First Name Unknown, Last Name Unknown ("**PANCHO**"): **PANCHO** appears to be a Hispanic male, approximately 5'10", 200 pounds, black hair and not currently otherwise identified. Refer to Attachment "C" for photograph of **PANCHO**. (collectively, the "**TARGET SUBJECTS**").

## TARGET SUBJECT INDEX

| *TARGET SUBJECT* | *PROBABLE CAUSE SECTION* |
|---|---|
| **TAPIA** | A-Q |
| **ZAMORA** | A, F, I J, K |
| **AGUILAR** | A, B, L |
| **ARMENDARIZ** | A, C, K |
| **CARDENAS** | A, C, D, M |
| **PANCHO** | A, O, P |

B.   **Premises to be Searched**

8.   This affidavit is also submitted in support of an application for warrants authorizing searches of the premises listed in ATTACHMENT A of this affidavit, which is incorporated herein by reference, and the seizure of evidence, contraband, fruits, and instrumentalities of violations of the aforementioned federal violations, more fully described in

7

ATTACHMENT B of this affidavit, which is incorporated herein by this reference.   The premises are as follows:

     a.   **TAPIA'S RESIDENCE 1**

507 North Ventura Street, Ojai, California, which I believe to be the residence of **TAPIA**.

     b.   **TAPIA'S PRELUDE**

A white 1998 Honda Prelude, bearing California license plate number ("CA#") 3XIE686, registered to Hugo TAPIA at TAPIA'S RESIDENCE 2, which I believe to be used by **TAPIA**.

     c.   **TAPIA'S RESIDENCE 2**

1138 West Hill Street, Oxnard, California is believed to be the residence of Aurora Tapia and Gustavo Tapia Sr. (TAPIA's parents), which I believe to be used by **TAPIA** as a storage place for firearms and other contraband and evidence of the same.

     d.   **AGULIAR'S RESIDENCE**

108 Dolores Court, Oxnard, California, which I believe to be the residence of **AGUILAR**.

     e.   **ZAMORA'S RESIDENCE**

1390 Saturn Street, Camarillo, California, which I believe to be the residence of **ZAMORA**. (collectively, the "SUBJECT PREMISES").

### ITEMS TO BE SEIZED

8

9.   The items to be seized as evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), conspiracy to distribute and possession with intent to distribute methamphetamine and Title 18, United States Code, Sections 371 and 922(a)(1)(A), conspiracy to engaging in the business of dealing firearms without a dealer license from the SUBJECT PREMISES are described in Attachment B and incorporated by reference herein.

## PROBABLE CAUSE

10.   Based on my personal investigation in this case, my conversations with other law enforcement officials involved in the investigation, including FBI Special Agent ("SA") Michael Easter, debriefing of confidential informants, review of electronic surveillance, reading law enforcement reports, and other sources, I learned the below information.

**A.   Summary of Investigation**

11.   In or around February 2011, VC-RIACT Task Force agents and officers began a criminal investigation into the unlawful trafficking of controlled substances and firearms by Oxnard area COCH[1] gang members and associates including the **TARGET SUBJECTS**.

---

[1] Law enforcement believes that the Colonia Chiques gang is Ventura County's largest and most violent gang and is engaged in homicides, robbery, theft, burglary, assaults, narcotics dealing, firearms dealing, home invasions and other violent

The **TARGET SUBJECTS** were identified by law enforcement officials and CI-1[2] and CI-2[3] as being involved in the distribution of methamphetamine and the dealing of firearms.  During the investigation, at the direction of law enforcement, including myself, CI-2 conducted controlled buys[4] of methamphetamine directly from **TAPIA** and **ZAMORA**. CI-2 also negotiated and conducted firearm purchases from **TAPIA**, **ZAMORA**, **ARMENDARIZ**, **CARDENAS**, and **AGUILAR**. The **TARGET SUBJECTS** also participated in meetings with CI-1 and CI-2 where multiple negotiations for

---

crimes. Law enforcement has also documented the COCH's direct ties to the Mexican Mafia organized crime syndicate.

[2] CI-1 has participated in several successful undercover operations. Through my direct involvement in this investigation, I know that beginning in March 2011, CI-1 began providing information to me and other investigators involved in the investigation about the narcotics sales of several Oxnard area criminal street gang members and narcotics dealers including **TAPIA**.  CI-1 has not worked for any other law enforcement agency.  CI-1 works for monetary compensation. CI-1's criminal history includes theft of vehicle, felon in possession of a firearm, possession of cocaine for sales and second degree robbery.

[3] CI-2 has participated in numerous undercover operations and has been a confidential informant for various federal law enforcement agencies since 1977. CI-2's information has assisted in over 200 federal indictments. CI-2 works for monetary compensation. CI-2's criminal history includes a conviction for driving under the influence.

[4] During a controlled buy, the informant's person is searched by law enforcement to confirm that the informant is free from possessing any illegal controlled substances, contraband, and any unaccounted money.  After the contact with the target the informant is again searched in this manner.

narcotics purchases occurred.  During the investigation, at the direction of law enforcement officials, including myself, CI-2 purchased approximately 138.7 grams of methamphetamine from **TAPIA** and **ZAMORA**. CI-2 was given 14.4 grams of cocaine and 1.0 grams of heroin by **TAPIA**. CI-2 also purchased one fully-automatic assault rifle, three semi-automatic assault rifles, and ammunition from **TAPIA,** and purchased 10 handguns and ammunition from **TAPIA, ZAMORA, ARMENDARIZ,** and **CARDENAS.** Moreover, **ZAMORA** was arrested while in control of Tapia's Honda that contained a hidden compartment that held approximately 496.5 grams of cocaine, 1.54 kilograms of heroin, 179 grams of methamphetamine, a loaded .38 caliber revolver handgun, a loaded 9mm semi-automatic handgun, and over 100 cartridges of various ammunition. In addition, **AGUILAR** was arrested while in possession of 412.5 grams of methamphetamine that he obtained from a **TAPIA**-controlled drug stash house.  Finally, **TAPIA, PANCHO** and others agreed to sell CI-2 ten (10) pounds of methamphetamine and four (4) kilograms of cocaine for $200,000, with a delivery date of October 25, 2011.

12.  Prior to each of the transactions described below, CI-2 was provided a specific amount of U.S. currency for the purpose of attempting to purchase methamphetamine and firearms. While participating in each of the transactions described below,

CI-1 and CI-2 were maintained under constant and/or intermittent visual observation by me and/or other members of VC-RIACT before, during, and after the controlled investigative narcotics purchases were completed. During the course of this investigation, CI-2 had several consensually recorded and monitored telephone conversations. I have reviewed the recorded telephone conversations, which corroborated the information provided to me and other law enforcement officials by the CIs.

13. During each narcotic transaction described herein, CI-2 was equipped with a recording device. I have reviewed the recordings made from the recording device used by CI-2 during this investigation and they corroborate the information provided to me by CI-2 in regards to the CI-2's contact with the **TARGET SUBJECTS**. I have also reviewed the digital video footage and digital photographs captured by law enforcement officials during the controlled investigative narcotic purchases. In addition, the recording devices provided real time transmission of the audio/video recording thereby allowing law enforcement to hear/view what was occurring as it occurred. My review of these items corroborated the information provided to me by CI-2 in regards to CI-2's narcotics and firearms transactions described herein.

14. The methamphetamine, cocaine and heroin purchased or

12

seized during each of the transactions described below were confirmed as such by the Drug Enforcement Administration ("DEA") Southwest Laboratory through qualitative and quantitative analysis.

**B.    March 8 - 9, 2011 TAPIA Shows CI-1 Vehicle with Hidden Compartment Containing Heroin, Cocaine, and Methamphetamine**

15.    On March 8, 2011, at approximately 2:20 p.m., CI-1 informed me that he/she had spoken to **TAPIA** via telephone.  CI-1 has known **TAPIA** since childhood and is also a member of the COCH gang and has correctly recognized **TAPIA's** voice and person. **TAPIA** informed CI-1 that he had returned from a trip to Mexico. **TAPIA** said he wanted to meet with CI-1 and discuss what he had done during his trip to Mexico.

16.    On March 9, 2011, at approximately 12:05 a.m., CI-1 met **TAPIA** in the parking lot of Pirates Grub & Grog Restaurant located at 450 South Victoria Avenue in the city of Oxnard. **TAPIA** was in the driver's seat of a maroon Honda Accord, CA# 4XUH552 ("Tapia's Honda").  **TAPIA** was with **AGUILAR** and an Unknown Female ("UF1") who were seated in the rear passenger compartment of the Tapia's Honda.  CI-1 knows **AGUILAR** from past contacts with **AGUILAR** and positively identified a booking photograph.

17.    CI-1 entered Tapia's Honda and sat in the front

13

passenger seat.  CI-1 was asked by **TAPIA** to follow him to drop

**AGUILAR** and UF1 at an unknown location in Port Hueneme.  CI-1

followed **TAPIA** to an apartment complex in Port Hueneme.  **AGUILAR**

and UF1 exited TAPIA's HONDA and walked into the apartment

complex.  CI-1 then followed **TAPIA** back to the restaurant,

arriving at approximately 12:24 a.m.  CI-1 then met with **TAPIA**

in TAPIA's HONDA.

18.  During the meeting, **TAPIA** showed CI-1 "traps"

(concealment compartments) located in Tapia's Honda used to hide

drugs, money, and weapons.  CI-1 advised SA Easter and me that

he/she observed the heroin, cocaine, and methamphetamine inside

the traps.  (Through CI-1's experience as a gang member he/she

has had past contacts with various narcotics and can identify

them).  CI-1 further said that the cocaine was stamped with a

Scorpion emblem.  Based on my training and experience, I know

that drug cartels commonly mark their narcotics with an emblem

or symbol in order to distinguish their narcotics from rival

cartels.

C.  MARCH 18, 2011, TAPIA Plans to Introduce CI-1 to TAPIA's
    Narcotics Source of Supply

19.  On March 18, 2011, CI-1 informed me that he/she had

spoken to **TAPIA** via telephone.  **TAPIA** informed CI-1 that he was

planning to meet a narcotics source of supply at Universal City

14

Walk.  **TAPIA** wanted to introduce CI-1 to the source of supply.

20.  SA Easter and I met with CI-1 in order to conduct surveillance of **TAPIA** and CI-1 and identify the narcotics supplier. Prior to meeting **TAPIA,** CI-1 picked up **ARMENDARIZ.** CI-1 has personally known **ARMENDARIZ** for several years and has correctly identified his booking photo.

21.  CI-1 met with **TAPIA,** and **TAPIA** told CI-1 that the trip was cancelled due to TAPIA's HONDA having mechanical problems and he needed to get it to a repair shop.  During the surveillance of CI-1 and **TAPIA,** **TAPIA** showed CI-1 and **ARMENDARIZ** one ounce of methamphetamine and explained that his source of supply was going to Bakersfield, California to pick up 20 pounds of methamphetamine.

D.  **APRIL 29, 2011, Introduction of CI-2 to TAPIA by CI-1**

22.  On April 29, 2011, law enforcement utilized CI-1 to introduce CI-2 to **TAPIA.**  CI-1 had arranged with **TAPIA** to meet CI-2 in the parking lot of Urban Home, 2801 Paseo Mercado, Oxnard, CA.  The purpose of the meeting was to provide **TAPIA** with a supplier of illegally obtained clothing for resale.  Upon arriving at the meeting location, CI-2 was provided several items of clothing that would be given to **TAPIA** as an ingratiation payment to facilitate their illegal business relationship and bolster part of CI-2's background as a clothing

15

importer.

23. At approximately 5:32 p.m., SA Easter heard via CI-1's digital recorder/transmitter, that he/she received a telephone call from **TAPIA**. CI-1 advised **TAPIA** of his/her location in the parking lot of Urban Home.

24. At approximately 5:34 p.m., TFO Roger Garcia and TFO Eric Alinaya observed and photographed **TAPIA** arrive in Tapia's Honda. **TAPIA** and a male, later identified by me based on a comparison of **CARDENAS'** booking photograph and my surveillance observations as **CARDENAS**, exited Tapia's Honda and greeted CI-1 and CI-2. **TAPIA** and CI-2 discussed narcotics and assault weapons in the presence of **CARDENAS** as they stood together at the trunk of CI-2's vehicle. **TAPIA** offered to sell CI-2 methamphetamine and two assault weapons. **TAPIA** offered CI-2 a sample of methamphetamine, but CI-2 declined as directed by SA Easter. **TAPIA** told CI-2 that he had two assault rifles being held for him by his sister in Bakersfield, CA. **TAPIA** agreed to talk via telephone about arranging a future transaction for the methamphetamine and assault rifles. **TAPIA** provided CI-2 with his telephone number (714) 306-4697 ("**TAPIA**'s Phone").

**E.    MAY 18, 2011 CI-2 Arranges the Purchase of a Quarter Pound of Methamphetamine from TAPIA**

25. On or about May 18, 2011, at approximately 10:13 p.m.,

16

SA Easter directed CI-2 to make a monitored and recorded phone call to **TAPIA** at **TAPIA**'s Phone to attempt to coordinate the sale of a quarter pound of crystal methamphetamine and firearms. During the recorded call, CI-2 advised **TAPIA** that he/she would be in the Oxnard area the next day (May 19, 2011).  CI-2 asked **TAPIA** about "farm equipment" (code for firearms)[5] in Bakersfield, CA.  **TAPIA** told CI-2 he was planning to go to Bakersfield that weekend, but he talked to a partner of his in Arizona that was a Marine, and he had "farm equipment" (firearms).  CI-2 also asked **TAPIA** if he had any "hand tools" (handguns) that he wanted to sell.  **TAPIA** told CI-2 he knew of one, but the guy wanted too much for it.  CI-2 then told **TAPIA** he had some friends that wanted to have a party and asked for four small ones (four ounces of crystal methamphetamine).  **TAPIA** responded, "Okay." CI-2 and **TAPIA** agreed to talk the following day.

F.  **MAY 19, 2011 TAPIA Sells a Quarter Pound of Methamphetamine to CI-2**

    26.  On or about May 19, 2011 at approximately 9:17 a.m., CI-2 conducted a monitored and recorded call with **TAPIA** on **TAPIA**'s Phone.  During the recorded call, CI-2 and **TAPIA**

_____

[5]  The interpretations set forth in parentheses following quotations in this affidavit are based on my training and experience, knowing that persons who deal in criminal activity often talk in code to avoid law enforcement detection, and based on my knowledge of this investigation.

arranged to meet around 1:00 or 2:00 p.m.  CI-2 asked **TAPIA**, "How much do I need for the paintings?" (crystal methamphetamine).  **TAPIA** explained that once he met with CI-2, he would have someone bring methamphetamine.

27.  At approximately 1:35 p.m., CI-2 conducted a monitored and recorded telephone call with **TAPIA** at **TAPIA**'s Phone.  During the recorded call, CI-2 advised **TAPIA** that he/she was in the area.  **TAPIA** asked CI-2 if he/she was in the same area as last time (referring to the April 29, 2011 meeting).  CI-2 told **TAPIA** no, that he/she had a room at the Hilton Garden Inn, located at 2000 Solar Drive, Oxnard, CA.  **TAPIA** told CI-2 he would be there soon.  CI-2 asked how much, and **TAPIA** told CI-2 he would talk to him/her in person.

28.  At approximately 1:57 p.m., SA Easter observed and videotaped, while TFO Alinaya observed and photographed **TAPIA** arrive in the parking lot driving a Blue BMW, CA/6PRU181 (BMW).  CI-2 and **TAPIA** greeted each other outside of their vehicle and then walked over to CI-2's vehicle.  CI-2 got into the driver's seat and the **TAPIA** got into the front passenger seat.

29.  As CI-2 and **TAPIA** entered CI-2's vehicle, CI-2 told **TAPIA** that he wanted to get "four small ones for the girls." **TAPIA** asked CI-2, "What are four small ones?"  CI-2 explained to **TAPIA** that he/she was referring to ounces.  **TAPIA** then said, "Oh

18

you want a QP" (quarter pound).  **TAPIA** then said, "Let me place
the order."  **TAPIA** removed his cell phone from his left front
pocket and attempted to call an unknown subject (suspected to be
**ZAMORA,** based on later events).  **TAPIA** said the person bringing
the methamphetamine was a female.  **TAPIA** said that he "doesn't
do it himself," he normally has someone bring it for him.
During the wait for the crystal methamphetamine, **TAPIA** asked CI-
2 what he/she normally paid.  **TAPIA** said, "I'll beat it."  CI-2
explained he/she usually paid eleven to twelve hundred.  **TAPIA**
said, "Nah, nah, I'll charge you one flat for you.  It's good, I
guarantee it."  CI-2 asked to clarify the total price and **TAPIA**
replied "four grand."  **TAPIA** told CI-2 that he would only charge
"one flat for each one." (one thousand dollars per ounce of
crystal methamphetamine).  **TAPIA** said, "I guarantee my stuff."
**TAPIA** received a call from the unknown subject (believed to be
**ZAMORA**) and asked if she was close by.  **TAPIA** instructed her to
park nearby and he would walk to her vehicle.  **TAPIA** discussed
with CI-2 future transactions for assault rifles and handguns.
CI-2 explained that he/she would pay $350-$500 for handguns and
$1,200-$1,500 for assault rifles.  **TAPIA** wanted to give the guns
to a third party who would sell them to CI-2.  **TAPIA** told CI-2
that he had someone selling handguns for $350.  **TAPIA** said
"anything after four" he would not pay for.  **TAPIA** continued to

19

explain that he had access to assault rifles for $1,500, and CI-2 said that was a good price.

30.   CI-2 said that he/she would possibly move up to ten to fifteen pound methamphetamine purchases.   **TAPIA** agreed and said, "Ok, that's cool."   **TAPIA** said he had a connection in Arizona who could provide him with "Mexican Bud" (referring to a type of marijuana).   **TAPIA** said he wanted to make $100,000 per transaction.   **TAPIA** said he had people to transport it for him. CI-2 asked if he had a network established.   **TAPIA** said "all his guys" are from the same "neighborhood" (i.e., the COCH gang) and are like a family.   **TAPIA** said that if something happens to one of the gang members that the gang would provide a lawyer and help them out.   **TAPIA** said that he had "groups" in Los Angeles and Orange County and they were all trusted.   **TAPIA** said he didn't let just anyone in his circle.

31.   CI-2 asked **TAPIA** what year his BMW was.   **TAPIA** said it was a 2002 and the vehicle belonged to his friend in Orange County who "did a bad deal and lost 23 grand of mine."   **TAPIA** said he was holding the vehicle until his friend paid him back. **TAPIA** said he was going to park it in a garage because he doesn't like driving "flashy" cars.   **TAPIA** said he doesn't work and doesn't want to drive nice cars (to avoid law enforcement suspicion).

32.  **TAPIA** explained to CI-2 that he usually picked up between $60,000-$80,000 worth of narcotics and distributed it. **TAPIA** said he sold high-quality cocaine for $22,000 per kilogram.  **TAPIA** said he sold high-quality cocaine so it could be cooked into rock cocaine.  **TAPIA** said that Baltimore, MD, bought kilograms of cocaine for $34,000 and New York for $35,000.  **TAPIA** said he had an out of state contact who he sold heroin to for $50,000.  **TAPIA** said he would get the heroin for $33,000 and make $15,000-$20,000 at a time.  **TAPIA** said he had connections with the cooks in Mexico and he must pre-order the heroin but the "glass" (crystal methamphetamine) came regularly. **TAPIA** said that his geographical area did not have the high quality narcotics that he could provide.  **TAPIA** said that he monopolized different areas and supplied them with his high quality narcotics.

33.  At approximately 2:21 p.m., **TAPIA** received a telephone call (via speaker phone).  The caller had a female voice and **TAPIA** called her "So Fresh."  From speaking to CI-1, I know **TAPIA** and others to call **ZAMORA** by the name of "So Fine," "So Fresh" and other variations of Sophia.  I later conducted a voice analysis of the subject on the speaker phone and compared it to a consensually recorded meeting where **ZAMORA**'s voice was captured.  After my analysis, I believe the subject on the

21

speaker phone was **ZAMORA**.  **TAPIA** directed her to park next to

his BMW.  **TAPIA** confirmed with CI-2 that he/she wanted "four"

(four ounces of methamphetamine).

34.  At approximately 2:23 p.m., SA Easter videotaped and

TFO Alinaya observed and photographed Tapia's Honda[6] park next to

Tapia's BMW.  **TAPIA** got into the front passenger seat of Tapia's

Honda.  **TAPIA** and the female driver both began to manipulate the

magnetic switch on the speedometer to open the concealed

compartment.  **TAPIA** then turned to the right rear passenger

compartment and recovered a white package from the concealed

compartment.

35.  **TAPIA** placed the package in his lap and manipulated

the package.  **TAPIA** then returned the package to the right rear

passenger/concealment compartment.  **ZAMORA** remained in the

driver's seat next to **TAPIA** the entire time.

36.  At approximately 2:26 p.m., **TAPIA** exited Tapia's Honda

carrying a weighted yellow and red plastic bag.  **TAPIA** returned

to CI-2's vehicle and sat in the front passenger seat.

37.  Once inside the vehicle, **TAPIA** handed the weighted

---

[6] On June 22, 2011, as described further below, Tapia's
Honda was impounded by the OPD.  During a search of the vehicle,
a hidden compartment was found in the right rear quarter panel.
The compartment was opened by operating a series of switches
from the driver's seat and concluded with operating a magnetic
switch on the speedometer area of the dashboard.

yellow and red plastic bag to CI-2.  CI-2 opened the bag and
said, "Looks pretty good, nice crystals."  **TAPIA** responded, "Its
good Dom, even when, even when you break down the stuff it's all
good.  A lot of people think it's huh, it's huh
[unintelligible]…like this."  (During the unintelligible
portion, **TAPIA** rubbed his thumbs and fingers together possibly
in an effort to demonstrate the breaking down the
methamphetamine crystals.)  CI-2 said, "Four thousand right."
($4,000).  **TAPIA** responded, "Yeah, yeah, yeah."

 38.  CI-2 then counted out $4,000 in cash and provided it
to **TAPIA**.  CI-2 and **TAPIA** then exited CI-2's vehicle.  CI-2
placed the weighted yellow and red plastic bag in the trunk.
CI-2 then showed **TAPIA** two firearms, an MP-5 assault rifle and
an AR-15 assault rifle.  **TAPIA** said, "Oh yeah, my sister-in-law
has one like that."  (Referring to the AR-15).  **TAPIA** then went
on to discuss getting the AR-15 for CI-2.  CI-2 said he/she
would be willing to pay $1,500.00 for **TAPIA**'s AR-15.

 39.  CI-2 then walked over to Tapia's Honda and **TAPIA**
introduced **ZAMORA** to CI-2 as "Marie."  (CI-2 later confirmed
**ZAMORA**'s identity through a booking photo).  **TAPIA** returned to
the BMW and left the parking lot followed by **ZAMORA** in Tapia's
Honda.  CI-2 also confirmed the only person in Tapia's Honda was
**ZAMORA**.

40.   Following the narcotics transaction on May 19, 2011, mentioned above, I obtained custody of the suspected methamphetamine that CI-2 purchased from **TAPIA**.  DEA lab results confirmed the drugs from the first plastic bag had a net weight of approximately 55.9 grams, with a purity of approximately 99.1%, which resulted in an actual methamphetamine amount of approximately 55.3 grams.  The drugs from the second plastic bag had a net weight of approximately 55.9 grams, and a purity of approximately 100%, which resulted in an actual methamphetamine amount of approximately 55.9 grams; thus, there was a total of approximately 112 grams of actual methamphetamine.

**G.    JUNE 2, 2011, CI-2 Call to TAPIA Thanking Him for the Methamphetamine CI-2 Purchased on May 19, 2011**

41.   At approximately 10:18 a.m., CI-2 conducted a monitored and recorded telephone call with **TAPIA** at TAPIA's Phone.  The purpose of the call was to thank **TAPIA** for the high-quality methamphetamine CI-2 had purchased on May 19, 2011.

42.   **TAPIA** answered the call and asked CI-2 "How was that, how was that thing man?"  CI-2 explained that everybody loved "the shirts" (methamphetamine).  **TAPIA** said that he had good news and told CI-2, "I got one of those things [firearms] for you.  Whenever you want to come down and pick it up, you know what I mean.  I got to go to Bakersfield, I got one of them."

24

CI-2 told **TAPIA** that he/she would arrange to meet with **TAPIA** the first week of June to conduct the firearm transaction.

**H.   JUNE 8, 2011 TAPIA Sells Two Assault Rifles and Cocaine to CI-2**

43.   After a recorded call on June 6, 2011 to set up the meeting, at approximately 11:47 a.m., CI-2 conducted a monitored and recorded telephone call with **TAPIA** on **TAPIA**'s Phone.   During the recorded call, CI-2 advised **TAPIA** that he/she would be in the area (Oxnard, CA) in about an hour.   **TAPIA** responded, "Okay, you just give me a call."

44.   Several monitored and recorded calls were made between **TAPIA** and CI-2 and they arranged to meet in a hotel in Camarillo.   At approximately 4:29 p.m., Tapia's Honda arrived in the parking lot of the hotel.   **TAPIA** was observed by me as he exited from the driver's door.   Additional Female 1 ("AF1") was identified by me as she exited the passenger's door of the vehicle.

45.   At approximately 4:30 p.m., TFO Alinaya observed and videotaped CI-1 and CI-2 greet **TAPIA** and AF1 next to their vehicles.   I observed **TAPIA** open the trunk of Tapia's Honda and AF1 stood outside of Tapia's Honda on the passenger side.   CI-2 began to look at and manipulate the guns in the trunk.   CI-2 offered **TAPIA** $2,000 for both rifles.   **TAPIA** replied "Yeah, yeah

that's cool." CI-2 removed the rifles from the trunk of Tapia's
Honda and placed them in his/her trunk. **TAPIA** then introduced
AF1 to CI-2. **TAPIA,** AF1, CI-1 and CI-2 walked into the hotel
and into the hotel room of CI-2.

46. Inside the hotel room, **TAPIA** and AF1 sat next to each
other on the couch throughout the majority of the drug/firearm
negotiations. CI-2 asked **TAPIA,** "Is two [$2,000] alright?"
**TAPIA** responded, "Yeah, yeah two is alright." CI-2 then counted
out $2,000 cash and provided it to **TAPIA.** **TAPIA** told CI-2 that
he had powder cocaine that he wanted to give to CI-2. **TAPIA**
said he had been stock piling guns to sell.

47. **TAPIA** talked about getting more guns for CI-2 from the
streets. **TAPIA** told CI-2, "I just don't want to get caught up
with the ATF [Alcohol Tobacco Firearms & Explosives]." **TAPIA**
talked about knowing a person several years ago who had a mini-
rocket launcher for sale. The person wanted $2,500 for the
launcher and almost the same for the rocket. **TAPIA** said, "When
we were younger we wanted to blow up the police
station…(laughter)…it was a sub-station." **TAPIA** told CI-2 that
when he was younger they burned down a police sub-station in
their neighborhood. CI-2 asked **TAPIA,** "The powder you are
talking about, what is it?" **TAPIA** responded, "Cocaine, cocaine.
It's high-grade, it's high-grade. It will numb your whole face

26

when you snort it." CI-2 asked **TAPIA**, "Are you getting a lot of that?" **TAPIA** responded, "Yeah, I am getting a lot. They sell it in big quantities, but lately I just bought one for myself just to make some extra cash you know."

48. **TAPIA** told CI-2 that he lost $10,000 the other day, he misplaced it. **TAPIA** told CI-2 it was a long story, he had it in a bag and he stashed all his stuff, but kept the money out roaming around with him. Someone took it out, threw it out because it was wrapped in cellophane. **TAPIA** said, "Because all my money I wrap it up it 10's, 10 G's, ten-thousand dollars, wrap it up in cellophane to kill the scent and then put paper around it…like sand paper. What do you call it, you know how?" AF1 said, "Fabric softener." **TAPIA** said, "Fabric softener to kill the scent, so the dog won't smell the money, so much money, because it goes back like that to Mexico." **TAPIA** discussed providing trap cars that could hold large quantities of drugs, guns and money. **TAPIA** explained to CI-2 that he likes to trade his narcotics for guns. By doing this, **TAPIA** said he gets the gun for half the price because he gets the narcotics at wholesale and trades it for the gun at market value. **TAPIA** then sells the gun for full price and makes the profit.

49. **TAPIA** told CI-2 that his father was involved in drug trafficking and that he (**TAPIA**) was the second generation. CI-2

27

asked **TAPIA** if he was getting most of his product (narcotics) from down there (Mexico). **TAPIA** said, "Yeah, yeah, yeah. It is like a pipeline from down there, from Mexico." **TAPIA** told CI-2 he gets narcotics all the time and that he has to pre-order it.

50. CI-1 told **TAPIA** to tell CI-2 about his heroin. **TAPIA** said, "I told you the heroin I got is like chocolate milk. I could get the China white, but the one I got is pretty good." **TAPIA** said he buys heroin by the kilogram. **TAPIA** told CI-2 he paid $33,500 per kilogram. **TAPIA** then said, "I am the only one that controls the market on that. I have people coming from far, as far as Orange County, Los Angeles, Central Coast past Santa Barbara. The guys in Santa Barbara pay top dollar for it." **TAPIA** told CI-2 he would buy a kilogram every week to two weeks. **TAPIA** also he would profit like $8,000 to $9,000. **TAPIA** said the stuff he gave CI-2 he made $12,000 to $13,000 per week. **TAPIA** said he made more money when he transported it out of state. CI-2 asked **TAPIA** if he would front him/her a sample of the "black" (heroin), so that he/she could show it to some people to see if they liked it. **TAPIA** said, "You know when I first started…I killed a lot of people with it (Heroin), it was so strong and it was good advertisement." **TAPIA** said sometimes it comes so strong that it kills people, but they still love it.

51. **TAPIA** told CI-2 he has a hard time hiding the money.

28

CI-2 asked **TAPIA** if he needed to "launder" his money. **TAPIA**
said, "Yeah, I probably do." CI-2 told **TAPIA** that he/she had
away that he/she could help **TAPIA** with his money. CI-2 said he
used to bury his money, but now he doesn't and he read business
books about making his money work for him.

52. **TAPIA** said, "You know what I'm doing right now? You
know how I've been living; it's nothing like a Ponzi scheme you
know mean, it's nothing like that." **TAPIA** told CI-2 that he
doesn't use his own money to buy product, he uses other people's
money to invest. Then he gives them a portion of the profit.

53. **TAPIA** told CI-2 that his business keeps him busy and
then said, "I know what it feels like to be a CEO."
At approximately 5:37 p.m., CI-1, CI-2, **TAPIA** and AF1 left the
hotel room and all four individuals walked over to Tapia's
Honda. SA Easter observed and videotaped, while TFO Alinaya
photographed **TAPIA** open the front driver's door and sit in
Tapia's Honda. **TAPIA** exited Tapia's Honda holding a light blue
item (later determined to be cocaine wrapped in a light-blue
latex glove), which he placed in CI-2's trunk. **TAPIA** described
it as a little rock (several grams of cocaine). **TAPIA** and AF1
then entered Tapia's Honda and drove out of the area.

54. Following the narcotics transaction on June 8, 2011,
mentioned above, I obtained custody of the suspected cocaine CI-

2 purchased from **TAPIA**.  DEA lab analysis confirmed a net weight

of approximately 14.1 grams of cocaine.

**I.**  **JUNE 17, 2011, TAPIA and ZAMORA sell CI-2 One Ounce of Methamphetamine and an Assault Rifle**

55.  On June 17, 2011, at approximately 12:00 p.m., SA

Easter and I met with CI-2 in room 219 at the Residence Inn,

2912 Petit Street, Camarillo, CA.  At approximately 12:27 p.m.,

I directed CI-2 to make a monitored and recorded telephone call

with **TAPIA** at **TAPIA**'s Phone to arrange the meeting for the

purpose of purchasing assault weapons.

56.  Tapia's Honda arrived and parked one stall west of CI-

2's vehicle.  **ZAMORA** exited the from the front passenger seat of

the vehicle.  At approximately 3:36 p.m., observed CI-1 and CI-2

meet with **TAPIA** and **ZAMORA** at the south east door of the hotel.

CI-2 and **TAPIA** walked to the trunk of Tapia's Honda.  CI-1 and

**ZAMORA** stood next to the vehicle.  **TAPIA** told CI-2 that he had

come from his "mom's house" and was going to bring CI-2 an

additional gun but he didn't know if CI-2 would want to purchase

it.

57.  CI-2 placed the rifle from Tapia's Honda into a black

gym style bag that CI-2 had brought down from the hotel room.

After collecting the rifle, **TAPIA**, **ZAMORA**, CI-1 and CI-2 entered

the hotel and into room 219.

58.    While inside room 219, CI-2 examined the assault rifle provided by **TAPIA**.  During CI-2's examination, **TAPIA** asked what the rifle was called because "everyone seems to like that li'l small one.  Looks like a fuckin' Taliban one."  **TAPIA** said, "looks intimidating though, tell you that much, on the streets."  After completing the examination of the rifle CI-2 asked **TAPIA** "What do you want for it?"  **TAPIA** said that two friends of his had offered him money for it but they did not know that it was not a fully automatic rifle.  **TAPIA** said he had two other offers from two separate individuals.  **TAPIA** said he was offered $2,500.  CI-2 told **TAPIA** that he was offered more than what the gun was worth and asked **TAPIA** what price he wanted to sell the rifle for.  **TAPIA** said that his "highest bidder was paying "3" ($3,000).  CI-2 said that it was not worth $3,000.  **TAPIA** said that he could "probably sell it for three, you know, I could probably get the three."  CI-2 then asked "Let me just ask you Bizee[7] (**TAPIA**), you say you've made some contacts on other guns now?"  **TAPIA** replied "A lot, yeah, a lot of different dudes."  **TAPIA** went on to explain that he had a connection in Mexico that he believed were corrupt law enforcement officers who could supply him with assault rifles, 300 at a time.  CI-2 asked **TAPIA** if he had any "product" (narcotics) with him.  **TAPIA** said

---

[7]    **TAPIA** used the moniker "Bizee" with CI-2.

"Yeah." CI-2 asked if he had any of the brown powder, referring to heroin. **TAPIA** said, "Yeah, I got some." CI-2 told **TAPIA** that he would like to send some of the heroin to his "people" in Las Vegas, NV, to see if they would be interested in it. **TAPIA** said, "Honestly it's so strong it killed six people already." CI-2 replied "Huh?" and **TAPIA** said, "It killed six people." CI-2 said, "It must be pretty strong." **TAPIA** replied, "Real strong."

59. CI-2 stood and picked up a white envelope from Harrah's casino from his/her briefcase and then removed money from the white envelope and counted out $3,000 cash. CI-2 then said "Three thousand ok? Fair enough?" **TAPIA** replied, "Yeah, it's fair."

60. **TAPIA** asked how much grenades went for, and CI-2 said four to five hundred dollars. **TAPIA** went on to state that his parents had property in Tecate, Mexico. **TAPIA** said he met people in Tecate, Mexico who could make "trap cars." **TAPIA** began talking about the "trap car" to CI-2 and said that he could get a car designed to carry assault rifles for CI-2. **TAPIA** said he does not like to show people his "trap car." CI-2 asked **TAPIA** if he had enough "brown" (heroin) to give to CI-2 for the purpose of sending it to his "people" to sample. **TAPIA** said he had enough. **TAPIA** then offered to show CI-2 his "trap

32

car."

61.   At approximately 4:06 p.m., **TAPIA** and CI-2 walked down to the parking lot to see **TAPIA**'s vehicle.  The vehicle was Tapia's Honda that he arrived in.  **TAPIA** and CI-2 entered Tapia's Honda.  **TAPIA** then explained that he only used that vehicle to transport cash, and that the traps were in the quarter panels in the back seat of the vehicle.  **TAPIA** then explained that it took a series of switches to open the trap. **TAPIA** then operated the trap and opened the quarter panels in the back seat, showing CI-2.  CI-2 then asked **TAPIA** if he had any glass (methamphetamine) or brown (heroin) that he could purchase.  **TAPIA** explained that it was very close by and that he did not carry the narcotics with him in this vehicle.  **TAPIA** told CI-2 that he would go get it and to wait in the parking lot.  **TAPIA** said he was going to go around the corner to get it and will only be five minutes.

62.   At approximately 4:12 p.m., CI-2 exited Tapia's Honda and waited in the parking lot for **TAPIA**.  CI-2 remained under observation by SA Easter and me.  OPD Detective Alvarez observed as **TAPIA** drove westbound in the parking lot and turned northbound and parked on the west side of the hotel.  Detective Alvarez observed that **TAPIA** did not meet with anyone.  Detective Alvarez had a clear view into the windshield of Tapia's Honda

33

and could clearly see **TAPIA** as he manipulated what Detective

Alvarez believed to be the traps in Tapia's Honda.  At

approximately 4:16 p.m., Detective Alvarez observed **TAPIA** drive

southbound in the parking lot and then westbound toward CI-2.

63.  At approximately 4:16 p.m., SA Easter and I observed

**TAPIA** park Tapia's Honda in the same parking stall he departed

from.  CI-2 then entered Tapia's Honda on the passenger side.

While inside the vehicle, **TAPIA** handed CI-2 the heroin and said,

"A li'l of this will hurt 'em."  **TAPIA** then handed CI-2 a clear

plastic bag containing methamphetamine and said, "if you want,

this is a thousand."  CI-2 told **TAPIA** that he would take the

methamphetamine and would give **TAPIA** the money upstairs in the

hotel room.

64.  At approximately 4:18 p.m., CI-2 and **TAPIA** arrived

back in hotel room 219.  CI-2 provided **TAPIA** another $1,000 in a

white envelope (for the methamphetamine).  **TAPIA** took the

envelope and then placed the $3,000 he had received from CI-2

for the assault rifle in the envelope.  **TAPIA** said that he had

lawyers that he talked to because he didn't want to get caught.

**TAPIA** offered to go half with CI-2 on a kilogram of heroin.

**TAPIA** said that he was looking for a connection to help bring in

money.  **TAPIA** said that he would hide across the border in

Mexico and run his business from there.  During the meeting in

the hotel room, **ZAMORA** sat next to **TAPIA** on the couch and was attentive to the conversation between CI-2 and **TAPIA**, and engaged in conversation with CI-2 while in the hotel.

65.  At approximately 4:41 p.m., **TAPIA** and **ZAMORA** exited the hotel room and walked down to the parking lot, and left the area.

66.  Following this transaction, I obtained custody of the methamphetamine and heroin.  DEA lab analysis confirmed a net weight of approximately 27.7 grams of methamphetamine, with a purity of approximately 99.7%, which resulted in an actual drug amount of approximately 27.6 grams.  The DEA lab also confirmed a net weight of .19 grams of heroin.

**J.    JUNE 21 - 22, 2011 Arrest of ZAMORA in Tapia's Honda and Seizure of Drugs, Guns, and Ammunition**

67.  On June 21, 2011, OPD Officers Martin Cook and Donald Ehrhardt conducted a traffic stop Tapia's Honda for a violation of California Vehicle Code 24601 (rear license plate lamp requirements).  **ZAMORA** was the driver of Tapia's Honda and was found to be under the influence of a controlled substance; she was arrested.  During the inventory search of the vehicle, Officer Cook located three bindles of methamphetamine in the driver's side door.  After locating the methamphetamine, a police service dog was used to continue the search of the

35

vehicle for additional narcotics.  During the search, the police service dog indicated there were narcotics in the rear passenger compartment of Tapia's Honda.

68.  On June 22, 2011, at approximately 1700 hours, I was the case agent for service on Tapia's Honda of a search warrant that Detective Serrato had authored and that was authorized by Honorable Superior Court Judge Ayers that same day.  During the search of the vehicle, a hidden compartment was located in the side panel of the rear passenger seat area.  I found the following items inside the hidden compartment:

       a.  2.52 pounds of heroin,

       b.  9.2 ounces of cocaine,

       c.  9.6 ounces of methamphetamine,

       d.  1.7 ounces of heroin,

       e.  $10,020 dollars in U.S. currency,

       f.  a loaded Taurus .38 caliber revolver, and a loaded Smith and Wesson semi-automatic 9mm handgun,

       g.  two (2) silver Smith and Wesson 9mm 16-cartridge law-enforcement-only high-capacity magazines,

       h.  50 rounds of "Wolf" .45 caliber ammunition, 50 rounds of "Winchester" .357 ammunition, 35 rounds of "Remington" .380 caliber ammunition, five rounds of .38 caliber ammunition, one round of .357

36

ammunition, one shotgun shell and six rounds of "Winchester" 9mm ammunition.

69.   I also searched the passenger compartment and located Honda of Oxnard paperwork in the name of Diana **ZAMORA**, several pieces of paperwork in the name of Luis **TAPIA**, pay/ owe sheets (accounting ledger used by drug traffickers), a plastic bag containing blue latex gloves that were consistent with the blue latex glove that **TAPIA** provided to CI-2 containing the cocaine on June 8, 2011, and a "Harrah's Casino" envelope which appeared to be the same "Harrah's Casino" envelope previously given to **TAPIA** by CI-2.

## K.   JULY 19, 2011, TAPIA, ARMENDARIZ and ZAMORA Sell CI-2 Three Firearms

70.   At approximately 1:40 p.m., the CI-2 conducted a monitored and recorded telephone call with **TAPIA** at (562) 673-3763 to arrange the meeting to purchase three firearms.

71.   At approximately 2:25 p.m. SA Easter observed, while TFO Alinaya photographed **TAPIA** arrive at the hotel driving a white Honda Prelude CA/3XIE686 (TAPIA'S PRELUDE).  SA Easter and TFO Alinaya observed a black Honda Civic 6MQF849 (CIVIC) arrive with **TAPIA**.  The vehicles parked next to each other in the south east corner of the parking lot.  The front passenger of the CIVIC exited from the passenger side door and was recognized by

TFO Alinaya to be Roger **ARMENDARIZ**.

72.   SA Easter and TFO Alinaya observed and photographed as **TAPIA** exited the driver's door and walked to the passenger side of TAPIA'S PRELUDE.   The passenger of TAPIA'S PRELUDE was identified by SA Easter and TFO Alinaya as **ZAMORA**.   SA Easter and TFO Alinaya observed as **ZAMORA** opened the passenger door to TAPIA'S PRELUDE and handed **ARMENDARIZ** a heavily weighted black plastic bag (later determined to contain three handguns). **ZAMORA** then exited TAPIA'S PRELUDE and all three walked toward the south east entrance to the hotel and into room 211.   Shortly after entering the hotel room, **ARMENDARIZ** was observed by SA Easter and I holding the black plastic bag and placing it on the table in the center of the room.   CI-2 then provided **TAPIA** with a red and silver coffee mug with the Marine Corps logo on two sides of the mug.   CI-2 gave a wild turkey foot to **TAPIA** as a gift.   **TAPIA** walked to the black plastic bag that was placed on the table by **ARMENDARIZ**.   **TAPIA** reached into the bag and removed an object wrapped in a clear plastic wrap.   **ARMENDARIZ** was observed by SA Easter and I unwrapping two handguns and placing them on the table in front of the CI-2.   As CI-2 inspected the handguns, **ARMENDARIZ** removed the third handgun from the plastic. **TAPIA** and CI-2 discussed the condition of the firearms and the high-capacity magazines.   CI-2 asked **TAPIA** "How much do you want

38

for these here, these three?" (The CI-2 was referring to the firearms.) **TAPIA** replied, "You know what Dom, seven. Can you give me seven for each one; seven hundred?" CI-2 asked, "Each?" **TAPIA** replied "Yeah." CI-2 informed **TAPIA** that he/she would give him seven hundred for two of the handguns but the third gun was only worth five hundred. CI-2 asked **TAPIA** if $1,900 was acceptable for all three guns and magazines, and **TAPIA** agreed by stating, "Yeah, that's cool." SA Easter and I observed as CI-2 walked over to a briefcase and removed another "Harrah's" envelope. CI-2 removed the cash from the envelope and counted out $1,900. CI-2 placed the $1,900 on top of the Harrah's envelope and gave it to **TAPIA**. **TAPIA** took the money and asked CI-2 about doing a larger gun deal for approximately 70 firearms. As **TAPIA** discussed this with CI-2, he was observed by SA Easter and me as he re-counted the $1,900 he received from CI-2. After verifying the money, **TAPIA** placed it in the "Harrah's" envelope that was given to him by CI-2. **TAPIA** told CI-2 that he could get assault rifles "all day long." **TAPIA** again told CI-2 that he could supply CI-2 with automatic rifles and other guns. **TAPIA** spoke about having to come back from "set-backs" but said that his "business" was doing well. **TAPIA** said that he knew where his money was located and it had been sitting there for a month. **TAPIA** said that he had friends that

were trying to help him get it.    (Note: **TAPIA** was referring to

Tapia's Honda with hidden compartments that was seized by law

enforcement on June 22, 2011).    **ARMENDARIZ** asked CI-2, "Are

there certain ones that they specific or any handgun?"    CI-2

replied, "Anything."    **ARMENDARIZ** then said, "But you rather have

the big assault rifle or automatic right?"    CI-2 explained that

the assault rifles were more valuable.    **TAPIA** said that he liked

.45 caliber handguns and that his wrist was sore from shooting

one recently.    During the firearms sale, **ZAMORA** was attentive to

the conversations occurring between **TAPIA**, **ARMENDARIZ** and CI-2,

and engaged in conversation with CI-2.

73.    At approximately 3:04 p.m., **TAPIA**, **ZAMORA**, and

**ARMENDARIZ** stood up and began to leave.    **TAPIA** placed the

Harrah's envelope in his back pocket.    At approximately 3:06

p.m., **TAPIA**, **ZAMORA** and **ARMENDARIZ** exited room 211.

L.    <u>AUGUST 4, 2011, AGUILAR Arrested with One Pound of</u>
       <u>Methamphetamine Obtained from TAPIA-Controlled Stash House</u>

74.    On August 4, 2011, at approximately 10:00 p.m., CI-1

informed me that **AGUILAR** had just picked up one pound of

methamphetamine from a **TAPIA**-controlled stash house located at

911 S. Ventura Road, Apartment E, Oxnard, California ("TAPIA's

stash house").[8]    I know the location as a TAPIA-controlled stash

---

[8] TAPIA's stash house is no longer believed to be operational as

because CI-1 informed me that he/she observed **TAPIA** use this location to store his supply of narcotics. CI-1 told me that no other narcotics dealers store narcotics at the location, and it was used to resupply persons who purchased narcotics from **TAPIA**. CI-1 said that **AGUILAR** communicated with **TAPIA** and informed **TAPIA** when TAPIA's stash house was low on a specific drug. I also spoke to Detective Ron Chips of the Ventura County Sheriff's Department who informed me that he had observed **TAPIA** at TAPIA's stash house where **TAPIA** met with a suspected source of supply and purchased narcotics. The source of supply vehicle was stopped, and approximately $50,000 in U.S. currency was found in the vehicle. CI-1 informed me that **AGUILAR** sold narcotics and also monitored the supply of narcotics for **TAPIA** at TAPIA's stash house.

75. I informed Officer Anthony McCowan of the OPD that **AGUILAR** was in the area of Ventura Road and Ninth Street in Oxnard and that he was possibly in possession of methamphetamine. I told Officer McCowan that **AGUILAR** was driving a black Toyota Camry #6PYT230/CA, and asked him to conduct a "wall stop"[9] if possible. Officer McCowan located the

_____

TAPIA and his associates have moved out.
[9]    A wall stop is when one law enforcement entity requests another entity to conduct a traffic stop based on the latter's independent probable cause and further requests that the entity

Camry parked and blocking the driveway of 711 Saratoga Street, City of Oxnard.  Officer McCowan drove closer to the vehicle and also noticed it had tinted windows, which appeared to be in violation of 26708(a) CVC.  Officer McCowan contacted **AGUILAR,** whom he recognized from prior contacts.  As Officer McCowan spoke to **AGUILAR,** he noticed a crystal-like substance consistent with crystal methamphetamine on top of the center console in plain view; he believed the substance to be methamphetamine.  A police service dog was used to walk around **AGUILAR**'s vehicle and it alerted several times to the odor of narcotics at the passenger door, and then the front passenger seat.  A search of the front passenger seat revealed a plastic container that contained a large amount of methamphetamine under the front passenger seat, along with **AGUILAR**'s wallet and **AGUILAR**'s California Drivers License.  **AGUILAR** said that anything found in the vehicle belonged to him.

M.    <u>AUGUST 23 and 25, 2011, TAPIA and CARDENAS Sell CI-2 Three</u>
      <u>Firearms</u>

      76.    On August 23, 2011, at approximately 9:40 a.m., CI-2 received an incoming call from telephone number (909) 451-3360. CI-2 identified the voice of the caller as being **TAPIA.**  CI-2

---

conducting the traffic stop not reveal the existence of the
larger investigation in order to not compromise its long term
goals.

arranged a meeting on August 25 for the purchase of several
firearms.

77.   On August 25, 2011 at approximately 4:15 p.m., CI-2
conducted a monitored and recorded telephone call to **TAPIA** at
(909)451-3360.   CI-2 arranged to meet with **TAPIA** at the Hilton
Garden Inn in Oxnard.

78.   At approximately 6:04 p.m., SA Easter observed, while
TFO Alinaya photographed **TAPIA** arrive at the hotel driving
TAPIA'S PRELUDE.   **TAPIA** was observed by SA Easter and
photographed by TFO Alinaya exiting the driver's door of TAPIA'S
PRELUDE.   **TAPIA** walked to the rear of TAPIA'S PRELUDE and opened
the trunk.   **TAPIA** then removed a black bag from the trunk.   The
bag appeared to be empty when **TAPIA** walked back to the driver's
side of TAPIA'S PRELUDE and leaned in.   When **TAPIA** exited
TAPIA'S PRELUDE, he slung the black bag over his shoulder.   The
bag was now heavily weighted and sagged in the middle.   **CARDENAS**
was identified by me as he exited TAPIA'S PRELUDE.   An
additional female ("AF2") (brown hair, approximately 22 years
old, 5'02", 115 lbs) exited **TAPIA**'S PRELUDE from the front
passenger seat.   SA Easter and TFO Alinaya observed and
photographed as **TAPIA**, **CARDENAS**, and AF2 walked together to the
main entrance of the hotel.   Detective Serrato observed as
**TAPIA**, **CARDENAS** and AF2 walked through the lobby to the

43

elevators.  At approximately 6:09 p.m., **TAPIA**, **CARDENAS,** and AF2 entered room 604.  CI-2, **TAPIA**, **CARDENAS,** and AF2 were monitored in room 604 via the CCTV with audio by SA Easter, TFO Alinaya and me.  **TAPIA** greeted CI-2 and introduced **CARDENAS** as "one of my little workers" and AF2 as "my pretty secretary."  Once inside the room, AF2 sat in the chair next to CI-2, and **TAPIA** sat across from CI-2 on the bed.  **CARDENAS** sat to the left of **TAPIA** on the bed.  CI-2 and **TAPIA** discussed their arrangements for the future meeting they had planned in Las Vegas, NV. During the discussion, CI-2 asked how many people **TAPIA** intended to bring.  **TAPIA** said three to five people who were all "trusted partners."  **TAPIA** said that some of his partners that would be with him might be quiet and just listen.  **TAPIA** said he was going to bring an "AK" (AK-47 assault rifle).  **TAPIA** said that when CI-2 was not in the area,  **TAPIA** hides his weapons "everywhere."  **TAPIA** said he had "some in Bakersfield" and "some in Orange County."  **TAPIA** showed CI-2 a chrome Smith & Wesson revolver he brought and explained it was "a real nice one, Smith & Wesson."  **TAPIA** said he was going to keep it but decided to sell it to CI-2.  CI-2 agreed and told **TAPIA** that he/she knew **TAPIA** likes revolvers.  **TAPIA** replied, "I do, I do, especially small ones like this cus' I can pop someone."  CI-2 began inspecting a second handgun and was asked by **CARDENAS** what the

handgun was called.  CI-2 informed **CARDENAS** that it was called a Harrison and Richards.  **CARDENAS** noticed that CI-2 was having difficulty opening the breech on the revolver and asked CI-2, "Do you know how to open it?  Do you want me to show you?" **CARDENAS** then assisted CI-2 and opened the breech of the handgun.  CI-2 said the Harrison and Richards was an "oldie goodie," and told **TAPIA** that it was a good gun for a silencer. **TAPIA** responded, "I know, I know."  CI-2 then examined the third gun and asked **TAPIA** what a fair price was for all three.  **TAPIA** said he had done some research and told CI-2, "Smith & Wesson, very hard to see on the street, it's in good condition, real good condition."  **TAPIA** asked CI-2 what he/she thought and continued to state, "I got a market for the street guns."  **TAPIA** saidd that people on the street asked him to get them specific caliber guns.  **TAPIA** said to CI-2, "I know I'm not gonna make as much as good as selling them to you."  CI-2 offered $1,300 for the three handguns.  **TAPIA** counter-offered and said, "how about $1,400?"  CI-2 agreed.  **TAPIA** asked CI-2 if he/she was interested in rifles.  **TAPIA** said that he took a .22 caliber rifle equipped with a scope.  CI-2 counted out the $1,400 dollars and gave the money to **TAPIA**.  **TAPIA** took the money and recounted it.  CI-2 asked **CARDENAS** if he was coming to Las Vegas.  **TAPIA** said that he was bringing him.  **CARDENAS** told CI-2

that they had met before.[10]

79.   **TAPIA** asked if CI-2 had someone that he could pay to contact an individual in Henderson, NV, who lost $100,000 worth of "stuff" (methamphetamine).   This is equivalent to approximately nine pounds of methamphetamine, according to **TAPIA's** stated bulk sale prices.   **TAPIA** said that the subject, named "Keith," was making a drug run to a state back east. Keith was claiming that he got rid of the narcotics to avoid police contact.   **TAPIA** said that his drug connection wanted **TAPIA** to send the muscle to "get" Keith.   **TAPIA** told CI-2 that his organization believed that Keith was robbed by a man named "Steve."   **TAPIA** said that Keith was the only one that could lead him to Steve.   **TAPIA** asked CI-2 because he/she had connections in the Las Vegas area.   **TAPIA** said he was going to go himself. **TAPIA** said that his organization was going to send someone from Mexico, however that person was no longer going to come.   **TAPIA** described the person that was going to be sent from Mexico as a "serious guy, cut your fingers off."   **TAPIA** said that they have people that do those things.   **TAPIA** said that Keith lives in Henderson, NV.

80.   **TAPIA** said that he could get handguns and fully automatic rifles.   **TAPIA** said he has connections in Orange

---

[10] **CARDENAS** was referring to the meeting on April 29, 2011.

County as well.  CI-2 told **TAPIA** that he/she may call him next week to buy more firearms.  **TAPIA** said that he "stockpiles" his weapons and spreads them out.  At approximately 6:35 p.m., **TAPIA, CARDENAS,** and AF2 exited room 604.

N.   <u>SEPTEMBER 8, 2011 TAPIA Sells CI-2 Three Handguns</u>

81.  At approximately 11:00 a.m., CI-2 received an incoming call from **TAPIA** at (562) 537-1736, a new phone number.  CI-2 recognized the voice of the caller to be **TAPIA**.  **TAPIA** discussed meeting together on 9-8-11 at approximately 4:30 p.m.  **TAPIA** discussed with CI-2 using CI-2's connections in Las Vegas, NV, to recover lost money from the subject in Henderson, Nevada. **TAPIA** told CI-2 that he had the guns stored in another location and he had to pick them up.  At approximately 5:35 p.m., SA Easter observed while TFO Alinaya photographed **TAPIA** arrive at the hotel driving TAPIA'S PRELUDE.  **TAPIA** was observed by SA Easter and photographed by TFO Alinaya exiting the driver's door of TAPIA'S PRELUDE.  **TAPIA** walked to the rear of TAPIA'S PRELUDE and opened the trunk.  **TAPIA** then removed a black bag from the trunk.  The bag appeared to be empty when **TAPIA** walked back to the driver's side of the vehicle and leaned in.  When **TAPIA** exited TAPIA'S PRELUDE, he slung the black bag over his shoulder.  The bag was now heavily weighted and sagged in the middle.  SA Easter and TFO Alinaya observed and photographed as

47

**TAPIA** walked to the main entrance of the hotel.  At approximately 5:47 p.m., **TAPIA** entered room 338.  **TAPIA** was holding a black bag as he entered the room.  Once inside the room, **TAPIA** sat down on the sofa and CI-2 sat in the chair next to **TAPIA**.  **TAPIA** told CI-2 that he could get "AK's" from Arizona.  **TAPIA** said, "He has to pay up front."  **TAPIA** asked CI-2 if he/she would want "AK's."  CI-2 asked **TAPIA** if the "AK's" were converted or fully automatic.  **TAPIA** told CI-2 that he had a local guy that could convert guns to fully automatic.  **TAPIA** told CI-2 that he could get "explosives" from a train.  CI-2 asked **TAPIA** if **TAPIA** got his hundred grand back.  **TAPIA** said that he had not got the hundred grand back but he did make the hundred grand back.  **TAPIA** told CI-2 that his vehicle (Tapia's Honda) was confiscated by the police.  **TAPIA** said that he had someone move the car, but they were pulled over and were under the influence.  **TAPIA** discussed trying to get his car back by getting a lawyer or by breaking into the tow yard.  CI-2 and **TAPIA** then talked about getting **TAPIA**'s $100,000 back from the subjects in Henderson, Nevada.  **TAPIA** also asked CI-2 if there was any way CI-2 could get him "silencers."  **TAPIA** said that he was friends with a machinist and he could make a silencer. **TAPIA** said that he could set up a meeting with his friend to talk about making silencers.  **TAPIA** explained that some of the

48

guys that he was bringing to their Las Vegas meeting were

narcotics dealers who helped him move his drugs to different

states.  **TAPIA** then showed CI-2 a silver Ruger revolver he

brought and explained that he "kind of wanted to keep this one

for myself, I like revolvers."  **TAPIA** told CI-2 that his friend

that he was bringing to Las Vegas "is a big dog" (major player

in narcotics trafficking).  **TAPIA** said his friend's dad was on

the FBI's Most Wanted and they were from the Sinaloa drug

cartel.  **TAPIA** then removed the three guns from the black bag

and discussed them with CI-2.  CI-2 then purchased the guns for

$1,300.  **TAPIA** told CI-2 that one of the friends coming to Las

Vegas was the one that he got all his guns from in Arizona.  At

approximately 6:34 p.m., **TAPIA** exited room 338.

O.  **SEPTEMBER 15-16, 2011, TAPIA and PANCHO Meet with CI-2 and
    an Undercover FBI Agent and Agree on a Ten Pound
    Methamphetamine and Four Kilogram Cocaine Deal**

82.  On September 15, 2011, CI-2 and a FBI agent acting in

an undercover capacity as CI-2's Las Vegas crime "boss" ("UCE")

met at the Palazzo Hotel, 3325 Las Vegas Blvd, Las Vegas, NV, in

order to discuss the planned operation to negotiate the purchase

of ten pounds of methamphetamine and four kilograms of cocaine

to be delivered in late October 2011.

83.  At approximately 6:55 p.m., CI-2 received an incoming

recorded and monitored call from **TAPIA** at telephone number (562)

537-1736.  CI-2 advised **TAPIA** he/she would meet him in a few minutes and to wait for him/her in the main lobby near registration.

84.  At approximately 7:10 p.m., investigators escorted CI-2 down the main lobby area of the Palazzo Hotel.  TFO Eric Alinaya and I observed CI-2 meet with **TAPIA** and an unidentified male who was introduced to CI-2 as "**PANCHO**" in the lobby area, who we suspected to be the "big dog" (major narcotics source of supply) **TAPIA** mentioned earlier.  CI-2 walked **TAPIA** and **PANCHO** to their room and asked them to come to his/her room to meet the UCE.

85.  At approximately 8:14 p.m., **TAPIA** and **PANCHO** arrived at CI-2's room.  Once inside CI-2's hotel room, **TAPIA** and **PANCHO** walked to the seating area and were introduced to the UCE. **TAPIA** introduced himself as "Bizze" and **PANCHO** introduced himself as "**PANCHO**" to the UCE.

86.  CI-2 told **TAPIA** that the UCE wanted to meet **TAPIA**, because CI-2 talked to the UCE about the product (narcotics) **TAPIA** gave him/her.  The UCE told **TAPIA** and **PANCHO** his/her problem in Las Vegas was that the price of the narcotics was "bouncing around."  The UCE told **TAPIA** and **PANCHO** he/she needed something that was consistent, referring to the pricing of the narcotics.  The UCE also talked to **TAPIA** about the quality of

50

the narcotics being consistent.  The UC said that CI-2 "is swearing the sample that you bought, that uh, the quarter was great, but can you, you know?"[11]  **TAPIA** responded, "Yes I can." The UC told **TAPIA** and **PANCHO** to be honest about how much narcotics they could produce.  The UC said, "Okay, so I don't know how your business is."  **TAPIA** said "[my] business is consistent; I try not to go out.  Maybe within the last two years, I only went out with it, with certain, 'cause I deal with everything.  So..."  The UCE inquired what everything was.

87.  **TAPIA** said, "I deal with Heroin.  I deal with um, I powder [cocaine].  I deal with glass [methamphetamine].  I deal with weed [marijuana]."  The UC asked about "ice" (crystal methamphetamine) and whether **TAPIA** could get that too.  **TAPIA** told the UC he could get "ice," but the UC needed to understand the different products.  **TAPIA** then discussed the quality of the different types of methamphetamine and that he knew the quality they were getting.  **TAPIA** and **PANCHO** also talked about the difficulty in getting the chemicals to make methamphetamine and that in few months the people that had "it" (methamphetamine) were not going to have it.  Only the people that were well connected, like **TAPIA** and **PANCHO**, were going to have it.  **TAPIA**

---

[11] The UC is referring to the May 19, 2011, quarter pound methamphetamine purchase conducted by CI-2 from **TAPIA**.

talked about the soldiers stopping all the chemicals coming from Asia into the ports.  **TAPIA** said, "We should not have a problem, us on our end.  We are not going to have a problem with that."  **TAPIA** and **PANCHO** talked about the pricing going up a little bit due to the difficulty in getting the chemicals.  **TAPIA** and **PANCHO** reaffirmed to the UC that their supply would be consistent.  **TAPIA** said, "We are like Walmart.  I will give you stuff, If you don't want it, give it back."

88.  **TAPIA** and the UCE then discussed the price per pound of methamphetamine.  **TAPIA** initially asked for $12,000 per pound.  The UCE negotiated for a lower price due to the amount he/she was purchasing.  **PANCHO** and **TAPIA** then agreed to sell the UCE ten pounds of methamphetamine for a total of $115,000.

89.  **TAPIA** talked about **PANCHO** knowing firsthand the pricing issues, because he just came back from Mexico.  The UCE confirmed the price of $115,000.  **TAPIA** looked at **PANCHO**, who said, "115" and then nodded his head in agreement.  **TAPIA** asked, "Is that the only thing you are requesting?"  The UCE asked, "What else can you put with the package?"  **PANCHO**, **TAPIA** and the UCE discussed the price of a kilogram of cocaine.  **TAPIA** said he could get two types of cocaine, generic and quality.  The good cocaine went for $23,000 per kilogram.  The UCE asked them to add three kilograms on top of his ten pounds of methamphetamine.

52

**TAPIA** said he would knock off $500 per kilogram.  The UCE and **PANCHO** decided on adding four additional kilograms of cocaine to the deal.  The parties confirmed the total price was $203,000.

90.  The UCE asked **PANCHO** and **TAPIA** to give him/her the ten pounds of methamphetamine and four kilograms of cocaine for $200,000.  They agreed to sell the UCE ten pounds of methamphetamine and four kilograms of cocaine for $200,000 and to conduct the transaction through CI-2 in four weeks.  CI-2 told **TAPIA** that he/she talked to the UCE about **TAPIA**'s problem in Henderson, Nevada.  **TAPIA** told the UCE that he had a guy in Henderson who owed him money.  CI-2 asked **TAPIA** if he brought the information about the guy in Henderson.  **TAPIA** told CI-2 he brought it, but it was in his hotel room.  The UCE asked **TAPIA** what he wanted to happen with the guy in Henderson.  **TAPIA** said he wanted the money back; that the guy took six pounds.  The UCE asked how much the guy owed **TAPIA**, and **TAPIA** looked at **PANCHO**. **PANCHO** told the UCE it was $100,000.  **TAPIA** said he wanted them to pay him a visit.  The UCE said okay, but it would cost 20%. **TAPIA** agreed to the price, and then discussed more details about why they owed money.  **TAPIA** gave the names of Keith and Steve as being involved in the stolen product.  **TAPIA** told CI-2 and the UCE that his organization had sent someone awhile back, but the target's family was around.  The UCE, CI-2, **TAPIA** and **PANCHO**

stood to leave the hotel room, and the UCE confirmed the deal for $200,000.

91.  At approximately 9:08 p.m., TFO Alinaya and TFO Todd Hourigan observed all four individuals get into a limousine and drive away from the hotel en route to Piero's Restaurant, 355 Convention Center Drive, Las Vegas, NV.  At approximately 9:15 p.m., Sergeant Greg Hebert and I were already positioned at the restaurant and observed all four individuals arrive and be seated for dinner.  At approximately 11:14 p.m., TFO Alinaya and TFO Hourigan observed the dinner conclude and all four individuals get into the limousine to return to the Palazzo Hotel.

92.  At approximately 11:23 p.m., all four individuals arrived at the Palazzo Hotel and CI-2 and the UCE separated from **TAPIA** and **PANCHO**.  At approximately 11:43 p.m., CI-2 and UCE returned to CI-2's hotel room.  SA Easter met with them to recover and deactivate the digital body recorders.  SA Easter and I debriefed CI-2 about the conversation during dinner.  CI-2 advised that **PANCHO** and **TAPIA** talked about paying off people at the Mexican-United States border in order to bring narcotics across in heavy equipment.  They were moving narcotics in tractor-trailers to Chicago.  **TAPIA** talked about picking up his money at night to avoid law enforcement surveillance.  CI-2 also

54

advised that during dinner, **TAPIA** said they could sell larger quantities of narcotics and they would be willing to deliver the ten pounds of methamphetamine the next day (9/17/2011).

P.   **September 17, 2011, TAPIA, PANCHO, Male Co-Conspirator, and AF2 meet with CI-2 and Discuss Recovering the Lost Drug Proceeds From Henderson, NV and Sale of More Firearms**

93.   On September 17, 2011, CI-2 was utilized to meet with **TAPIA**, **PANCHO**, a male co-conspirator, and AF2 in order to obtain information about the individual in Henderson, Nevada who owed them $100,000 for lost methamphetamine, and to discuss the purchase of firearms.

94.   CI-2 asked **PANCHO** and **TAPIA** if there were any questions about the order from last night (ten pounds of methamphetamine and four kilograms of cocaine.)  **TAPIA** said the first one was all set, but they could double it next time.  Then they returned to the topic of Keith and Steve.  **PANCHO** told CI-2 that they need to get at both of them, referring to CI-2's people locating them.

95.   At approximately 12:36 p.m., CI-2 asked **PANCHO** what he could do with the gun stuff.  CI-2 and **PANCHO** then discussed the different types of weapons; they mentioned AK-47, AR-15, full-auto, and assault weapons and guns/bullets that could pierce law enforcement vests.  **PANCHO** explained to CI-2 that he had a gun supplier in LA and the male co-conspirator stated there was a

55

machinist in Oxnard who could covert rifles to full automatic. They continued to discuss details of different firearms.  At approximately 1:04 p.m., the meeting concluded.

Q.   OCTOBER 19, 2011 TAPIA Sells a Fully Automatic Assault Rifle and a Handgun to CI-2

96.  On October, 19, 2011, **TAPIA** sold CI-2 a fully-automatic assault rifle and a .38 handgun with ammunition.  The deal was audio/video recorded.

EVIDENCE OF CRIMES LIKELY TO BE FOUND AT SUBJECT PREMISES

97.  As previously stated, I have been employed as a law enforcement officer for more than eight years and have been assigned to an FBI Gang Task Force for the past year.  Through my employment, I have developed a detailed understanding of narcotics conspiracies and related illegal activities including the collection of narcotics trafficking by criminal street gangs and their associates.

98.  Based on my training, experience, discussion with experienced law enforcement officers and agents, discussions with criminal defendants and confidential informants, I know that persons involved in controlled substance and firearms trafficking commonly keep the ITEMS TO BE SEIZED (described in ATTACHMENT B) at their residences, "stash houses," vehicles, located at their residences or "stash houses," or places of

56

business.

99.   I also know, based on my training and experience, that persons who are engaged in the trafficking of controlled substances and firearms, like the **TARGET SUBJECTS**, as described herein, generally remain in the practice of trafficking in controlled substances and firearms until apprehended by law enforcement and therefore maintain quantities of controlled substances and firearms at their residences, in their vehicles, on their person, and at their places of business.

100.   I know from my training and experience that individuals involved in the unlawful trafficking and distribution of illegal controlled substances and firearms will often use pagers and cellular phones in the furtherance of their criminal activities.  I know that pagers and cellular phones are used so that distributors of illegal controlled substances and firearms can be reached at any time or location by the purchasers of the controlled substances and firearms, thereby not losing any opportunities for sales due to the inability to be contacted.  Also, this precludes the need for distributors to give purchasers their home telephone numbers, their by decreasing the risks of their identities and residences being discovered by persons who might want to rob them of their unlawful drugs, firearms or monies, and/or any law enforcement

official who may be investigating their unlawful activities.

101.   Furthermore, often during the course of searches pursuant to illegal controlled substance and firearms search warrants, pagers and cellular phones are found which are functioning and are activated by suspected potential buyers of illegal narcotics and firearms, and that it is necessary to look at the phone numbers displayed on the pager and/or cellular phone, in the furtherance of investigating the unlawful trafficking and distribution activities of the subject(s) of the search warrant.   Therefore, I request that any pagers, cellular phones, and the numbers and contacts contained inside them, be seized as items of evidence.

102.   I know from my training and experience that individuals involved in the trafficking and distribution of illegal controlled substances and firearms commonly keep and maintain records pertaining to their illegal activities.   These include data on drug quantities and firearms bought and sold customers and criminal associates, drug and firearm debts, and assets obtained with drug and firearm proceeds and profits. Such records are commonly kept at the premises where the drugs are packaged and sold, and often secured in safes, lock boxes, files, and other secure or concealed locations not in the immediate vicinity of the illegal controlled substances and

firearms. These persons will often keep or maintain drugs, firearms, records and proceeds in different rooms, buildings, garages, locations, and vehicles associated with the ongoing criminal enterprise. This facilitates easy access for the trafficker and/or distributor of the illegal controlled substances and firearms, while affording protection from unwanted discovery. These records include ledgers, address books, telephone toll records, notes, messages, photographs, and video films, indicating drug and firearm sales, debts, and criminal affiliates.

103. I know from my training and experience that persons involved in the manufacturing and/or delivery of illegal controlled substances and sales of firearms often times keep amounts of cash on hand. This is because of the lucrative nature of the business, the fact that it is a cash business and the need to accumulate money in order to re-supply themselves. It is also necessary to keep cash on hand to conduct additional transactions, make changes, and pay drug debts. As described above, I believe that the **TARGET SUBJECTS**, are involved in ongoing distribution of controlled substances and firearms and accept cash for payment, therefore, it is more likely than not, that cash (money) will be found at the locations described.

104. I know from my training and experience that persons

involved in the trafficking and distribution of illegal controlled substances commonly use packaging materials and scales to re-package the controlled substances into smaller quantities to sell to individual purchasers, and that these packaging materials and scales will be found at the same location as the controlled substances. Because **the TARGET SUBJECTS** are involved in the trafficking and distribution of controlled substances, it is more likely than not that packaging material and scales will be found at the locations. In addition, sellers of methamphetamine usually mix methamphetamine with other substances in order to dilute it and add to its weight. I know that substances such as MSM (Methysulfonylmethane) are sometimes added to methamphetamine. I know that equipment such as scales, sifters, hammers, grinders, razor blades, glass panes, mirrors, kilo or pound presses, heat sealers, heat sealable bags, zip-loc bags, paper bindles and baggies are needed to prepare controlled substances including methamphetamine, cocaine and heroin for sale. I know that methamphetamine, cocaine and heroin are often mixed and packaged in the seller's residence, at a stash house, and sometimes in a vehicle.

    105. I know from my training and experience that individuals involved in the trafficking and distribution of

illegal controlled substances and firearms often hide narcotics and firearms in many places inside and outside their associated residences, including vehicles, mattresses, safes, inner walls, bathroom fans, outbuildings, garages, gardens, lawns, the ground, and secret compartments. I am therefore seeking to search all areas of the mentioned premises, and the curtilage therein including any vehicles on the property. Narcotics and firearms traffickers use various locations, to serve different functions so that customers, thieves, and law enforcement officers do not learn about any one location where large quantities of narcotics, firearms, money and/or other drug and firearm related assets, are stored. Therefore, one or more locations, including a vehicle, are often used to store lesser amounts of narcotics, money, and/or drugs, related assets, while additional locations are used to meet customers.

106. I know from my training and experience that cell phones (and their contents) pagers (and their contents), drug records, packaging material, and weapons (including rifles, shotguns, handguns and ammunition) are tools of the trade and instrumentalities of the crime of manufacturing, delivering, and trafficking illegal narcotics and firearms. I am therefore seeking to seize these items.

107. Based on my training and experience, and speaking

61

with law enforcement officials familiar with individuals who traffic in controlled substances and firearms, I know that people who sell controlled substances and firearms will sometimes use vehicles not registered to them and use multiple addresses for their residences to attempt to thwart police investigations, including the address of relatives.  Based on my training and experience, and speaking with law enforcement officials familiar with individuals who traffic in controlled substances and firearms often will not update their address in an effort to disguise their true residences from law enforcement.

108.  Based on my training and experience, I know that people who sell controlled substances and firearms, namely criminal street gang members, often possess firearms, ammunition, and related equipment to protect their drugs, drug proceeds and personal possessions purchased with drug proceeds, and to use for purposes of enforcement against rival gang members and drug distributors who may seek to encroach on the gang's territory.

109.  Based on my training and experience, narcotic traffickers maintain books, records, customers lists, receipts, notes, ledgers and other papers, for extended periods of time, relating to the transportation, ordering, sales and distribution

of controlled substances and equipment, even though such documents may be in code.   Traffickers also commonly "front" drugs to their customers, which requires documentation to ensure accurate recording of such transactions.

### EVIDENCE LINKING TARGET SUBJECTS TO SUBJECT PREMISES

**A.   TAPIA'S RESIDENCE 1**

110.   On October 18, 2011, I reviewed DMV driver's license information that revealed **TAPIA** resides at the address of TAPIA'S RESIDENCE 1.   I also reviewed a law enforcement database, which confirmed that **TAPIA** resides at the address of TAPIA'S RESIDENCE 1.   I also reviewed law enforcement databases that revealed that **TAPIA** was contacted by the OPD on April 8, 2011 and he provided the address of TAPIA'S RESIDENCE 1.

**B.   TAPIA'S PRELUDE**

111.   On October 18, 2011 I conducted a DMV records check and found that TAPIA'S PRELUDE is registered to **TAPIA'S** brother at TAPIA'S RESIDENCE 2.   As stated above, drug traffickers often drive vehicles registered in other people's names in order to thwart law enforcement.   During this investigation, **TAPIA** was frequently observed during surveillance by me and other detectives driving TAPIA'S PRELUDE to the deals (See above Probable Cause Sections K, L, and M).

## C.   TAPIA'S RESIDENCE 2

112. On October 11, 2011, I spoke to CI-1 who informed me that **TAPIA** currently stores illegal firearms in a vehicle in the rear yard of TAPIA'S RESIDENCE 2.  CI-1 also told me that **TAPIA** keeps an AK-47 assault rifle behind the front door of **TAPIA'S RESIDENCE 2** for defense against rival drug dealers, including use of the AK-47 by **TAPIA's** father.[12]  In addition, Ventura County Sheriff's Deputy Detective Ron Chips informed me that during narcotics related surveillance, he had observed **TAPIA** depart TAPIA'S RESIDENCE 2 to meet a known narcotics source of supply on June 30, 2011 at 12:30 p.m.  Further, TAPIA'S PRELUDE is registered to TAPIA'S RESIDENCE 2.  I also reviewed commercial databases that revealed that TAPIA'S RESIDENCE 2 is occupied by **TAPIA's** parents.  Finally, TAPIA made reference to being at his "mom's house" prior to delivering firearms to CI-2. (See above Probable Cause Section I).

## D.   ZAMORA'S RESIDENCE

113.  On October 18, 2011, I reviewed DMV driver's license information that revealed that **ZAMORA** resides at ZAMORA'S RESIDENCE.  On October 18, 2011, I reviewed DMV vehicle information (5UQB393 1996 HONDA 4dr) showing that it was

---

[12] As noted above, **TAPIA** said that his father was previously involved in narcotics trafficking.

registered to **ZAMORA,** with the address of ZAMORA'S RESIDENCE.
On October 18, 2011, I reviewed law enforcement database
information regarding **ZAMORA**'s current address summary, which
also listed ZAMORA'S RESIDENCE.   On May 21, 2011, the OPD
arrested ZAMORA for narcotics related charges and she provided
the address of ZAMORA'S RESIDENCE.

**E.   AGULIAR'S RESIDENCE**

114.   On October 18, 2011, I reviewed DMV driver's license
information that revealed that **AGUILAR** resides at AGULIAR'S
RESIDENCE.   On October 18, 2011, I reviewed DMV vehicle
information showing a vehicle registered to **AGUILAR,** 8W46296
2006 GMC Pickup, with the address of AGULIAR'S RESIDENCE.   On
October 18, 2011, I reviewed law enforcement databases regarding
Spring Cellular utility service in the name of **AGUILAR,** which
listed AGULIAR'S RESIDENCE.   On March 27, 2011, the OPD
contacted **AGUILAR** during a verbal domestic and he provided
AGULIAR'S RESIDENCE as his address.

<u>CONCLUSION</u>

115.   Based on the foregoing facts, there is probable cause
to believe that **TAPIA, ZAMORA, AGULIAR, ARMENDARIZ, CARDENAS,**
and **PANCHO** have committed violations of Title 21, United States
Code, Sections 846, 841(a)(1), 841(b)(1)(A)(viii), conspiracy to
distribute and to possess with the intent to distribute

controlled substances, namely at least 50 grams of methamphetamine and of Title 18, United States Code, Section 371, 922(a)(1)(A), conspiracy to willfully engage in the business of dealing firearms without a dealer license.

116.   In addition, based on the foregoing facts, there is probable cause that evidence, contraband, fruits, and instrumentalities of violations, Title 21, United States Code, Sections 846 and 841(a)(1), conspiracy to distribute and possession with intent to distribute controlled substances, and Title 18, United States Code, Section 371 and 922(a)(1)(A) conspiracy to willfully engage in the business of dealing firearms without a dealer license, will be found at or in the **SUBJECT PREMISES**.

_____
Richard Marquez Jr.
Task Force Officer, FBI


Sworn to before me and subscribed in my presence this 24th day of October 2011

CARLA M. WOEHRLE
_____
HONORABLE CARLA WOEHRLE
UNITED STATES MAGISTRATE JUDGE

66