DECLARATION OF CAMERON L. SCHROEDER

I, Cameron L. Schroeder, declare as follows:

1.   I am an Assistant United States Attorney and am assigned to the matter of United States v. Luis Manuel Tapia, No. CR 11-1068-ODW, and the related civil case number, No. CV 19-0071-ODW.

2.   Attached hereto as Exhibit A is a true and correct copy of an email communication from Mack Jenkins to Brian Newman dated February 9, 2012, attaching the government's plea offer of the same date.

3.   Attached hereto as Exhibit B is a true and correct copy of an email communication from Mack Jenkins to Brian Newman dated June 10, 2013, attaching the government's plea offer of the same date.

4.   Attached hereto as Exhibit C is a true and correct copy of an email communication from Mack Jenkins to Marilyn Bednarski dated March 20, 2014, communicating the terms of the government's revised plea offer.

5.   Attached hereto as Exhibit D is a true and correct copy of a letter from Mack Jenkins and myself to Marilyn Bednarski dated May 9, 2014, confirming defendant's rejection of the government's last plea offer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on August 22, 2019.

_____
CAMERON L. SCHROEDER

# EXHIBIT A

| | |
|---|---|
| **From:** | Jenkins, Mack (USACAC) |
| **To:** | Brian Newman |
| **Cc:** | Schroeder, Cameron (USACAC) |
| **Subject:** | US v. Tapia |
| **Date:** | Thursday, February 9, 2012 11:02:37 AM |
| **Attachments:** | TAPIA, L - Plea Offer.pdf |

Brian – please find attached the proposed plea offer to your client.  As we briefly discussed, the charges against your client are extremely serious and he faces a mandatory minimum sentence of life imprisonment on two fronts based off of (i) the Continuing Criminal Enterprise charge (21 USC 848(b),(s)) and/or (ii) the two 851 enhancements that we filed.  In addition, we believe the evidence is overwhelming based off of the numerous a/v recordings, audio interceptions, multiple seizures, percipient witnesses, etc.   Accordingly, any offer will require a significant sentence and plea to all currently known facts.  I will note, however, that we believe Mr. Tapia has some potentially valuable information that we would be willing to discuss; and I believe that would be his best chance of reducing his (staggering) sentencing exposure.

Please let me know his response to this offer by close of business on **Friday March, 9, 2012** at which point this offer will automatically expire and we will move forward with the mandatory life charges.

Feel free to give me a call to discuss the offer if you believe he is interested in a prompt pre-trial resolution.  Thanks.

**Mack E. Jenkins** | **Assistant United States Attorney**
**Organized Crime and Drug Enforcement Task Force**
United States Courthouse, Suite 1400 | 312 N. Spring St. | Los Angeles, California 90012
T: 213.894.2091| F: 213.894.0142 | mack.jenkins@usdoj.gov

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. State Bar No.: 242101)
Assistant United States Attorney
OCDETF Section
     1400 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-2091
     Facsimile: (213) 894-0142
     E-mail: mack.jenkins@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 11-1068-ODW-1 |
| | ) | |
| Plaintiff, | ) | PLEA AGREEMENT FOR DEFENDANT LUIS MANUEL TAPIA |
| | ) | |
| v. | ) | |
| | ) | |
| LUIS MANUEL TAPIA, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

1.   This constitutes the plea agreement between defendant LUIS MANUEL TAPIA ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a) At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), as charged in Count One of the Indictment in the above-captioned case and admit the allegation in count one of the information filed against defendant on November 18, 2011 pursuant to Title 21, United States Code, Section 851.

b) Not contest facts agreed to in this agreement.

c) Abide by all agreements regarding sentencing factors contained in this agreement.

d) Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e) Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f) Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and submits a completed financial statement (form OBD-500) to the USAO prior to sentencing.

<u>THE USAO'S OBLIGATIONS</u>

3.  The USAO agrees to:

a) Not contest facts agreed to in this agreement.

b) Abide by all agreements regarding sentencing factors contained in this agreement.

2

c) At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed counts in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

d) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e)    At the time of sentencing, move to dismiss Count Two of the information filed against defendant on November 18, 2011 pursuant to Title 21, United States Code, Section 851. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed count of the information in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

g)    With respect to count one, recommend that defendant be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.

NATURE OF THE OFFENSE

4.   Defendant understands that for defendant to be guilty of the crime charged in Count One, the following must be true: first, there was an agreement between two or more people to possess with the intent to distribute methamphetamine, or some other prohibited drug, and, second, defendant became a member of that conspiracy knowing of this object and intending to help accomplish it. Defendant admits that defendant is, in fact, guilty of this offense as described in Count One of the Indictment.

5.   Defendant understands that for defendant to be subject to the statutory maximum and statutory minimum sentences set forth below, under Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), the government must prove beyond a reasonable doubt that the conspiracy, during the course of defendant's membership therein, engaged in the distribution of at least fifty grams of actual methamphetamine.  Defendant admits that defendant, in fact, conspired and agreed to possess with the intent to distribute at least fifty grams of actual methamphetamine, as alleged in Count One of the Indictment.

PENALTIES

6.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 21, United States, Sections 846, 841(a)(1) and 841(b)(1)(A), is: lifetime imprisonment; a lifetime period of supervised release; a fine of $10 million; and a mandatory special assessment of $100.

7.   Defendant understands that the statutory mandatory minimum sentence that the Court must impose for such a violation

4

is: ten years imprisonment and a five-year period of supervised release. Defendant further understands that because defendant admits that defendant committed a violation of Title 21, United States Code, Section 841(a), (b)(1)(A), as charged in count One of the indictment, after a prior conviction for a felony drug offense had become final, as alleged in the information filed pursuant to Title 21, United States Code, Section 851 on 18, November 2011, the mandatory minimum sentence that the Court must impose for this violation is: 20 years' imprisonment; a 10-year period of supervised release; and a mandatory special assessment of $100.

8. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

9. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition. Defendant

understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

10.   Defendant understands that if defendant is not a United States citizen, the felony conviction in this case may subject defendant to removal, also known as deportation, which may, under some circumstances, be mandatory.  The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that by entering a guilty plea defendant waives any claim that unexpected immigration consequences may render defendant's guilty plea invalid.

FACTUAL BASIS

11.   Defendant and the USAO agree to the statement of facts provided below.  Defendant and the USAO agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth below, but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Beginning on a date unknown and continuing to on or about October 25, 2011, defendant Luis Manuel TAPIA, aka "Taps," aka

6

"LT," conspired and agreed with co-defendants "Pancho," first name unknown, last name unknown ("PANCHO"), Diana Sophia ZAMORA, aka "So Fresh," aka "So Fine" ("ZAMORA"), EDGAR RAFAEL AGUILAR, aka "Li'l Silent," aka "Silent," aka "Pilot" ("AGUILAR"), Roger Gonzales ARMENDARIZ, aka "Chumash," aka "Twenty-four" ("ARMENDARIZ"), and Jaime CARDENAS, aka "Terco," aka "Li'l Pilot" ("CARDENAS"), and others, who were members of a drug and firearm trafficking organization (collectively the "TAPIA DTO"), to (i) possess with the intent to distribute methamphetamine, heroin, and cocaine and (ii) to sell firearms.  Defendant became a member of this conspiracy knowing of these objects and intending to help accomplish them.  Moreover, Defendant TAPIA would lead, direct, and manage the TAPIA DTO.

In furtherance of the conspiracy, defendant committed at least the following acts in Ventura County:

- On March 8, 2011, defendant TAPIA, during a telephone conversation, told a person he believed to be a narcotics and firearms customer but who was, in fact, a confidential informant working for the Federal Bureau of Investigation ("FBI") (hereinafter "CI-1"), that defendant TAPIA had just returned from Mexico and had some business to discuss with CI-1.

- On March 9, 2011, defendant TAPIA and co-defendant AGUILAR met with CI-1 to discuss defendant TAPIA's trip to Mexico and defendant TAPIA's knowledge of the interactions between the La Familia Michaocana drug cartel and Southern California gangs with respect to narcotics trafficking.

- On March 9, 2011, defendant TAPIA showed CI-1 his Honda car that contained hidden compartments to store contraband ("TAPIA's Honda"), which at that time contained methamphetamine, heroin, and cocaine.

- On March 18, 2011, defendant TAPIA, using coded language during a telephone conversation, told CI-1 that defendant TAPIA wanted to introduce CI-1 to defendant TAPIA's narcotics source of supply.

- On March 18, 2011, defendant ARMENDARIZ and CI-1 met with defendant TAPIA in order to meet defendant TAPIA's narcotics

source of supply but the trip was cancelled because defendant TAPIA's Honda needed repairs; instead, defendant TAPIA showed co-defendant ARMENDARIZ and CI-1 one ounce of methamphetamine and stated that defendant TAPIA's narcotics source of supply was going to obtain twenty pounds of methamphetamine.

- On March 31, 2011, defendant TAPIA and co-defendant ARMENDARIZ met with other members of the TAPIA DTO to discuss possible government informants in the TAPIA DTO and possibly burning down the house of or assaulting an individual who had been associating with a rival drug trafficking organization.

- On April 29, 2011, defendant TAPIA and co-defendant CARDENAS met with another person they believed to be a narcotics and firearms customer but who was, in fact, a confidential informant working for the FBI (hereinafter "CI-2"), and discussed future narcotics and firearms sales, namely, future transactions involving methamphetamine and two assault rifles.

- On May 18, 2011, defendant TAPIA, using coded language during a telephone conversation, agreed to sell four ounces of methamphetamine and firearms to CI-2.

- On May 19, 2011, defendant TAPIA, using coded language during a telephone conversation, finalized the plan to sell the four ounces of methamphetamine to CI-2 and told CI-2 that defendant TAPIA would have someone bring the narcotics to their transaction.

- On May 19, 2011, defendant TAPIA met with CI-2 and then contacted co-defendant ZAMORA to bring the methamphetamine to the meeting.

- On May 19, 2011, defendant TAPIA told CI-2 that defendant TAPIA would (a) beat any price for methamphetamine that CI-2 was currently paying; (b) guarantee the quality of his drugs; and (c) agree to possibly move up to fifteen-pound methamphetamine sales with CI-2.

- On May 19, 2011, defendant TAPIA, during the same conversation with CI-2, further discussed (a) the prices for assault rifles ($1,200-$1,500) and handguns ($350-$500); (b) that he wanted to make $100,000 per drug sale; (c) that he imported marijuana from Mexico through Arizona; (d) that he had narcotics-trafficking groups established in Los Angeles and Orange Counties and that he only used trusted groups to distribute his narcotics; (e) the different market bulk prices in various states for cocaine and heroin; (f) that he had connections with methamphetamine manufacturers in Mexico so he could obtain methamphetamine regularly; and (g) that he monopolized different narcotic distribution areas because he supplied them with high-quality narcotics.

- On May 19, 2011, defendant TAPIA told co-defendant ZAMORA to bring the four ounces of methamphetamine to the transaction with CI-2.

- On May 19, 2011, co-defendant ZAMORA, driving defendant TAPIA's Honda, took the four ounces of methamphetamine to the transaction with CI-2, assisted defendant TAPIA in performing the sequence of actions required to open the hidden compartment in defendant TAPIA's Honda where the narcotics were hidden, and assisted defendant TAPIA in re-packaging the narcotics for delivery to CI-2.

- On May 19, 2011, defendant TAPIA, aided by co-defendant ZAMORA, sold CI-2 approximately 111.2 grams of methamphetamine in exchange for $4,000.

- On May 19, 2011, defendant TAPIA told CI-2 that defendant TAPIA's sister-in-law had an AR-15 semi-automatic assault rifle that he would be willing to sell to CI-2.

- On June 2, 2011, defendant TAPIA, using coded language during a telephone conversation, confirmed with CI-2 that the four ounces of methamphetamine (from the May 19, 2011 transaction) were of high quality and told CI-2 that defendant TAPIA had a gun to sell CI-2.

- On June 8, 2011, defendant TAPIA and an unindicted co-conspirator met with CI-1 and CI-2 at a hotel in Camarillo, California, and defendant TAPIA sold CI-2 a Norinco, SKS assault rifle, a Bushmaster, AR-15 assault rifle, and ammunition for a total of $2,000.

- On June 8, 2011, defendant TAPIA, during the firearms transaction, told CI-2 that he (a) had been stockpiling guns for sale; (b) had burned down a police station in their neighborhood; (c) typically obtained significant quantities of high-grade cocaine; (d) sent his narcotics proceeds back to Mexico; (e) could obtain vehicles with hidden compartments; (f) traded his narcotics for guns; (g) had a narcotics-supply pipeline running from Mexico; (h) paid $33,500 per kilogram of heroin; (i) controlled the market on heroin; (j) had heroin customers throughout Southern California and sold a kilogram of heroin every week or two weeks, but made more money transporting and distributing heroin out of state; and (k) believed that heroin that was so strong that it killed people was a "good advertisement."

- On June 8, 2011, defendant TAPIA also told CI-2 that he (a) needed help laundering his money; (b) used other people's money to purchase his narcotics; and (c) knew what "it fe[lt] like to be a CEO."

- On June 8, 2011, defendant TAPIA gave CI-2 approximately 14.1 grams of cocaine.

9

-       On June 17, 2011, defendant TAPIA and co-defendant ZAMORA met at a hotel in Camarillo, California, and sold CI-2 an ITM Arms, model MK-99, assault rifle and ammunition for $3,000, and defendant TAPIA told CI-2 that he had just come from his (defendant TAPIA's) mother's house and that he had an additional gun he could potentially sell to CI-2.

-       On June 17, 2011, defendant TAPIA also told CI-2 that he (a) had connections in Mexico that he believed were corrupt law enforcement officers who could supply him with 300 assault rifles at a time; (b) had distributed heroin that killed six people; (c) was interested in the price of grenades; (d) had a source in Tecate, Mexico, who could make cars with hidden compartments ("trap cars"); (e) liked to keep his own trap car secret but would show CI-2 the hidden compartments in his trap car; and (f) had heroin to distribute to CI-2 as a sample.

-       On June 17, 2011, defendant TAPIA, assisted by co-defendant ZAMORA, sold CI-2 approximately 27.6 grams of methamphetamine in exchange for $1,000 and provided CI-2 with approximately .19 grams of heroin as a sample, which narcotics had been secreted in the hidden compartment in defendant TAPIA's Honda.

-       On June 17, 2011, defendant TAPIA asked if CI-2 would enter into an agreement to split the cost of a kilogram of heroin and told CI-2 that defendant TAPIA was looking for help smuggling narcotics proceeds.

-       n June 22, 2011, co-defendant ZAMORA possessed on the passenger seat of defendant TAPIA's Honda three bindles of methamphetamine, paperwork belonging to defendants ZAMORA and TAPIA, and pay/owe sheets.  In addition, defendant TAPIA and co-defendant ZAMORA further possessed in the hidden compartment of defendant TAPIA's Honda the following items: approximately 234 grams of methamphetamine; 1.13 kilograms of heroin; 532 grams of cocaine; a loaded Taurus .38 caliber revolver; a loaded Smith & Wesson 9mm handgun; two Smith & Wesson 9mm law-enforcement-only, high-capacity magazines; 50 rounds of .45 caliber ammunition; 51 rounds of .357 caliber ammunition; 35 rounds of .380 caliber ammunition; five rounds of .38 caliber ammunition; one shotgun shell; six rounds of 9mm ammunition; and $10,020 in cash.

-       On July 19, 2011, defendant TAPIA and co-defendants ZAMORA and ARMENDARIZ met in the parking lot of a hotel, and co-defendant ZAMORA handed co-defendant ARMENDARIZ a black bag containing three handguns.

-       On July 19, 2011, defendant TAPIA and co-defendant ZAMORA and ARMENDARIZ met CI-2 in a hotel room and sold CI-2 ammunition and the following three handguns: (a) a Glock, model 17, 9mm caliber handgun; (b) a Ruger, Security model, .357 caliber handgun; and (c) a Daewoo, model DP51C, 9mm caliber handgun.

- On July 19, 2011, defendant TAPIA, during the firearms transaction with co-defendants ZAMORA and ARMENDARIZ, told CI-2 that he (a) had high-capacity magazines; (b) wanted to do a larger gun transaction involving approximately 70 guns; (c) could supply CI-2 with automatic rifles and other guns; (d) had recently suffered a law enforcement seizure of his contraband; and (e) had a sore wrist from recently shooting a .45 caliber gun.

- On August 4, 2011, co-defendant AGUILAR obtained approximately one pound of methamphetamine, which was packaged in a clear plastic Rubbermaid container with a red lid, from defendant TAPIA's Stash House.

- On August 23, 2011, defendant TAPIA, using coded language during a telephone conversation, set up a meeting on August 25, 2011 to sell firearms to CI-2.

- On August 25, 2011, defendant TAPIA and co-defendant CARDENAS, and an unindicted co-conspirator, met with CI-2 in a hotel and sold CI-2 ammunition and the following three handguns for $1,400: (a) a Smith & Wesson, model 586, .357 caliber handgun; (b) a Ruger, Security Six model, .357 caliber handgun; and (c) a Harrison & Richards, model 999, .22 caliber handgun, and co-defendant CARDENAS showed CI-2 how to operate the Harrison & Richards handgun.

- On August 25, 2011, defendant TAPIA, during the meeting with co-defendant CARDENAS and CI-2, stated that he (a) hid his weapons in various counties; (b) had an AK-47 assault rifle; (c) liked small revolvers such as the Smith & Wesson handgun because they were easier to use to shoot someone; (d) had a market for street guns; and (e) had a .22 caliber rifle with a scope.

- On August 25, 2011, defendant TAPIA, during the meeting with co-defendant CARDENAS and CI-2, further stated that he (a) was looking for an unindicted co-conspirator who had lost $100,000 worth of defendant TAPIA's drugs; (b) knew his organization contemplated sending up "a serious guy, cut your fingers off [type]" from Mexico to obtain the narcotics or money back; and (c) could obtain automatic weapons and handguns from his stockpiles that he hid in multiple locations.

- On September 8, 2011, defendant TAPIA, during a meeting in a hotel room, sold CI-2 ammunition and the following three handguns for $1,300: (a) a Ruger, model SP101, .38 caliber handgun; (b) a Sig Sauer, model P229, .40 caliber handgun; and (c) a Bryco Arms, model 38, .380 caliber handgun.

- On September 8, 2011, defendant TAPIA, during the meeting in the hotel room, told CI-2 that he (a) had a source for AK-47 assault rifles; (b) knew that defendant TAPIA's Honda had been seized by the police; (c) was interested in obtaining silencers and had a source who could make them; and (d) would be bringing narcotics sources to a Las Vegas meeting with CI-2.

11

-      On September 16, 2011, defendant TAPIA and co-defendant PANCHO, in a hotel room in Las Vegas, Nevada, met with CI-2 and a person defendant TAPIA and co-defendant PANCHO believed was the crime boss of CI-2 but who was, in fact, an undercover FBI agent (the "UC"), in order to negotiate the sale of ten pounds of methamphetamine and four kilograms of cocaine in exchange for $200,000.

-      On September 16, 2011, defendant TAPIA, at the meeting in Las Vegas, further stated that he (a) distributed heroin, powder cocaine, methamphetamine, marijuana, and crystal methamphetamine; (b) dealt in high-quality methamphetamine and sold it for $12,000 per pound; (c) knew that there were difficulties in obtaining methamphetamine from Mexico and only well-connected people like defendant and PANCHO would be able to obtain it regularly; (d) sold both generic and quality types of cocaine with the latter costing $23,000 per kilogram; (e) along with PANCHO, wanted the UC to pay a visit to the unindicted co-conspirator who had lost their $100,000-worth of narcotics and would pay the UC $20,000 for the job; and (f) knew that their organization had previously sent someone to recover the money but that no action was taken at that time because the unindicted co-conspirator's family was present on that occasion.

-      On September 16, 2011, defendant TAPIA and co-defendant PANCHO attended a dinner with the UC and CI-2 in order to further discuss their illegal business relationship, and during this dinner, defendant and PANCHO stated (a) that they paid off people at the Mexico-United States border in order to import narcotics in heavy equipment; (b) that they transported drugs to Chicago in tractor trailers; (c) that they could sell larger quantities than the ten pounds of methamphetamine and four kilograms of cocaine they had previously agreed to supply to the UC and CI-2; and (d) that they were ready to deliver the ten pounds of methamphetamine the next day.

-      On September 17, 2011, defendant TAPIA and co-defendant PANCHO, and unindicted co-conspirators, attended a further meeting in the Las Vegas hotel room with CI-2, during which PANCHO stated (a) that the ten pound methamphetamine and four kilogram cocaine deal they had discussed was finalized; (b) that they could double the quantities of the drug deal (to twenty pounds and eight kilograms, respectively) next time; (c) that defendant and PANCHO wanted CI-2's help in tracking down the two individuals responsible for the $100,000 loss to their organization and provided the targets' personal information and addresses to CI-2; (d) that he could provide AK-47s, AR-15s, fully automatic weapons, and guns that fire ammunition capable of piercing law enforcement vests; and (e) that he had a connection to a machinist who could convert semi-automatic guns into fully automatic weapons.

-      On October 19, 2011, defendant TAPIA, during a meeting in a hotel room, sold CI-2 a fully automatic AK-47 assault rifle,

12

a Taurus, 38 Special model, .38 caliber handgun, and ammunition for $1,900.

- On October 19, 2011, defendant TAPIA, during the meeting in the hotel room, told CI-2 that defendant TAPIA (a) just wanted a gun that "shoots people"; (b) had given one of his personal guns to the machinist he had mentioned in their previous meeting to work on; (c) had a connection in Los Angeles, California, for M-16s, MP-5s, AK-47s, and Desert Eagle rifles; (d) would get more guns from co-defendant PANCHO and their Arizona gun source; and (e) confirmed that the methamphetamine and cocaine deal they had previously discussed was set to go and that defendant TAPIA had recently obtained 15 pounds of methamphetamine from his source, while another person had obtained 80 pounds and another 30 pounds of methamphetamine from the same source.

- On October 25, 2011, defendant TAPIA and co-defendant ZAMORA distributed ten pounds of methamphetamine to CI-2 to partially consummate the deal previously negotiated in Las Vegas.

- On October 25, 2011, defendant TAPIA and co-defendant ZAMORA, in a hidden compartment inside defendant TAPIA's Prelude, possessed approximately 310 grams of a mixture and substance containing a detectable amount of methamphetamine and a loaded Mauser-Werke, .22 caliber handgun.

- On October 25, 2011, defendant TAPIA, at his parents' residence on West Hill Street in Oxnard, California, possessed an AK-47 assault rifle, a sawed-off shotgun, and approximately $10,000 in cash.

## SENTENCING FACTORS

12. Defendant understands that in determining defendant's sentence the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

13.    Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level [At least 1.5kg of actual meth] | : | 38 | [U.S.S.G. § 2D1.1(c)(1)] |
| Leader/Organizer | : | +4 | [U.S.S.G. § 3B1.1(a)] |
| Possession of Firearm | : | +2 | [U.S.S.G. § 2D1.1(b)(1)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.  Defendant understands that defendant's offense level could be increased if defendant is a career offender under U.S.S.G. §§ 4B1.1 and 4B1.2. If defendant's offense level is so altered, defendant and the USAO will not be bound by the agreement to Sentencing Guideline factors set forth above.

14.    Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

15.    Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

### WAIVER OF CONSTITUTIONAL RIGHTS

16.    Defendant understands that by pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

14

c) The right to the assistance of an attorney at trial, including the right to have the Court appoint an attorney to represent defendant at trial.  Defendant understands, however, that, despite defendant's guilty plea, defendant retains the right to be represented by an attorney -- and, if necessary, to have the Court appoint an attorney if defendant cannot afford one -- at every other stage of the proceeding.

d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e) The right to confront and cross-examine witnesses against defendant.

f) The right to testify on defendant's own behalf and present evidence in opposition to the charges, including calling witnesses and subpoenaing those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h) Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, any outstanding discovery, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

17. Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

<u>LIMITED WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK</u>

18. Defendant agrees that, provided the Court imposes a total term of imprisonment of 30 years or less, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the conditions of probation or supervised release imposed by the Court, provided the term is less than ten years.

19.  Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines

20.  The USAO waives its right to appeal defendant's sentence, provided it is within the statutory minimum and maximum.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

21.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the

16

USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## EFFECTIVE DATE OF AGREEMENT

22.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

23.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be

17

able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

24. Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a) Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b) Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c) Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND PROBATION OFFICE NOT PARTIES</u>

25. Defendant understands that the Court and the United States Probation Office are not parties to this agreement and

18

need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

26. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations are not error, although each party agrees to maintain its view that the calculations above are consistent with the facts of this case. While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

27. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement. Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

28. Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

29. The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ANDRÉ BIROTTE JR.
United States Attorney


_____          _____
MACK E. JENKINS                            Date
Assistant United States Attorney


_____          _____
LUIS MANUEL TAPIA                          Date
Defendant


_____          _____
BRIAN A. NEWMAN                            Date

Attorney for Defendant
Luis Manuel Tapia

20

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          _____
LUIS MANUEL TAPIA                              Date
Defendant

21

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am LUIS MANUEL TAPIA's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____          _____
BRIAN A. NEWMAN                                    Date
Attorney for Defendant
Luis Manuel Tapia

22

EXHIBIT B

| | |
|---|---|
| **From:** | Jenkins, Mack (USACAC) |
| **To:** | Brian Newman (jjnewbee@sbcglobal.net) |
| **Cc:** | Schroeder, Cameron (USACAC) |
| **Subject:** | US v. Tapia: Plea Offer #2 |
| **Date:** | Monday, June 10, 2013 8:10:08 PM |
| **Attachments:** | TAPIA, L - Plea Offer 2.pdf |

Brian – thank you for taking the time to meet with us today.  Pursuant to our discussions, please find attached a revised plea agreement to your client.  In sum, it as follows:

- Plead guilty to a 10 year man min drug count + 851 enhancement (for 20 year man min) and dismiss all remaining counts that would otherwise mandate a *life* sentence;

- *No* agreement on sentencing factors or Guideline range, thus all Guidelines arguments are available to both sides;

- Appeal waiver *lowered* from 30 years to 25 years;

- Factual Basis significantly *cut* to just include facts related to the (still numerous) law enforcement seizures of drugs/guns;

- All names *removed* from Factual Basis Section.

Please provide us your client's response to this revised plea offer by the end of the month, **June, 28, 2013 at 5 p.m**. at which point this offer will automatically terminate.  As we discussed this afternoon, and as Cameron and I confirmed internally after you left, you can convey to your client that -- with the possible exception of cooperation (intel) -- any future plea offer, if one is offered, will be less favorable to him.

As always, please do not hesitate to contact Cameron or me with any questions.


**Mack E. Jenkins | Assistant United States Attorney**
**Public Corruption & Civil Rights Section**
United States Courthouse, Suite 1300 | 312 N. Spring St. | Los Angeles, California 90012
T: 213.894.2091| F: 213.894.0142 | mack.jenkins@usdoj.gov

ANDRÉ BIROTTE JR.
United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. State Bar No.: 242101)
Public Corruption & Civil Rights Section
CAMERON L. SCHROEDER (Cal. State Bar No.: 255016)
National Security Section
Assistant United States Attorneys
      1300 United States Courthouse
      312 North Spring Street
      Los Angeles, California 90012
      Telephone: (213) 894-2091/0596
      Facsimile: (213) 894-0142
      E-mail: mack.jenkins@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | CR No. 11-1068-ODW-1 |
|---|---|---|
| Plaintiff, | )<br>)<br>) | PLEA AGREEMENT FOR DEFENDANT LUIS MANUEL TAPIA |
| v. | ) | |
| LUIS MANUEL TAPIA, et al., | )<br>) | |
| Defendants. | )<br>)<br>) | |

1.  This constitutes the plea agreement between defendant LUIS MANUEL TAPIA ("defendant") and the United States Attorney's Office for the Central District of California ("the USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

DEFENDANT'S OBLIGATIONS

2.  Defendant agrees to:

a) At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to violation of Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), as charged in Count One of the Indictment in the above-captioned case and admit the allegation in count one of the information filed against defendant on November 18, 2011 pursuant to Title 21, United States Code, Section 851.

b) Not contest facts agreed to in this agreement.

c) Abide by all agreements regarding sentencing factors contained in this agreement.

d) Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e) Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f) Be truthful at all times with Pretrial Services, the United States Probation Office, and the Court.

g) Pay the applicable special assessment at or before the time of sentencing unless defendant lacks the ability to pay and submits a completed financial statement (form OBD-500) to the USAO prior to sentencing.

THE USAO'S OBLIGATIONS

3.  The USAO agrees to:

a) Not contest facts agreed to in this agreement.

2

b) Abide by all agreements regarding sentencing factors contained in this agreement.

c) At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed counts in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

d) At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e)    At the time of sentencing, move to dismiss Count Two of the information filed against defendant on November 18, 2011 pursuant to Title 21, United States Code, Section 851. Defendant agrees, however, that at the time of sentencing the Court may consider the dismissed count of the information in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed after consideration of the Sentencing Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

3

NATURE OF THE OFFENSE

4.    Defendant understands that for defendant to be guilty of the crime charged in Count One, the following must be true: first, there was an agreement between two or more people to possess with the intent to distribute methamphetamine, or some other prohibited drug, and, second, defendant became a member of that conspiracy knowing of this object and intending to help accomplish it. Defendant admits that defendant is, in fact, guilty of this offense as described in Count One of the Indictment.

5.    Defendant understands that for defendant to be subject to the statutory maximum and statutory minimum sentences set forth below, under Title 21, United States Code, Sections 846, 841(a)(1), and 841(b)(1)(A), the government must prove beyond a reasonable doubt that the conspiracy, during the course of defendant's membership therein, engaged in the distribution of at least fifty grams of actual methamphetamine.  Defendant admits that defendant, in fact, conspired and agreed to possess with the intent to distribute at least fifty grams of actual methamphetamine, as alleged in Count One of the Indictment.

PENALTIES

6.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 21, United States, Sections 846, 841(a)(1) and 841(b)(1)(A), is: lifetime imprisonment; a lifetime period of supervised release; a fine of $10 million; and a mandatory special assessment of $100.

7.    Defendant understands that the statutory mandatory minimum sentence that the Court must impose for such a violation

4

is: ten years imprisonment and a five-year period of supervised release.  Defendant further understands that because defendant admits that defendant committed a violation of Title 21, United States Code, Section 841(a), (b)(1)(A), as charged in count One of the indictment, after a prior conviction for a felony drug offense had become final, as alleged in the information filed pursuant to Title 21, United States Code, Section 851 on November 18, 2011, the mandatory minimum sentence that the Court must impose for this violation is: 20 years' imprisonment; a 10-year period of supervised release; and a mandatory special assessment of $100.

8.  Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

9.  Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.  Defendant understands that once the court accepts defendant's guilty plea, it will be a federal felony for defendant to possess a firearm or ammunition.  Defendant

5

understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

10.  Defendant understands that under 21 U.S.C. § 862a, defendant will not be eligible for assistance under state programs funded under the Social Security Act or Federal Food Stamp Act or for federal food stamp program benefits, and that any such benefits or assistance received by defendant's family members will be reduced to reflect defendant's ineligibility.

11.  Defendant understands that if defendant is not a United States citizen, the felony conviction in this case may subject defendant to removal, also known as deportation, which may, under some circumstances, be mandatory.  The court cannot, and defendant's attorney also may not be able to, advise defendant fully regarding the immigration consequences of the felony conviction in this case.  Defendant understands that by entering a guilty plea defendant waives any claim that unexpected immigration consequences may render defendant's guilty plea invalid.

<u>FACTUAL BASIS</u>

12.  Defendant and the USAO agree to the statement of facts provided below.  Defendant and the USAO agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing

6

Guidelines factors set forth below, but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Beginning on a date unknown and continuing to on or about October 25, 2011, defendant Luis Manuel TAPIA, aka "Taps," aka "LT," conspired and agreed with co-conspirators ("CC"), including CC-1, CC-2, CC-3, CC-4, and CC-5, and others, who were members of a drug and firearm trafficking organization (collectively the "TAPIA DTO"), to (i) possess with the intent to distribute methamphetamine, heroin, and cocaine and (ii) to sell firearms. Defendant became a member of this conspiracy knowing of these objects and intending to help accomplish them.

In furtherance of the conspiracy, defendant committed at least the following acts in Ventura County:

- On May 18, 2011, defendant TAPIA, using coded language during a telephone conversation, agreed to sell four ounces of methamphetamine and firearms to a person defendant TAPIA believed was a narcotics customer but who was, in fact, a confidential informant working for the FBI ("CI-2").

- On May 19, 2011, defendant TAPIA, using coded language during a telephone conversation, finalized the plan to sell the four ounces of methamphetamine to CI-2 and told CI-2 that defendant TAPIA would have someone bring the narcotics to their transaction.

- On May 19, 2011, defendant TAPIA told co-defendant CC-3 to bring the four ounces of methamphetamine to the transaction with CI-2.

- On May 19, 2011, defendant TAPIA, aided by CC-3, sold CI-2 approximately 111.2 grams of methamphetamine in exchange for $4,000.

- On June 8, 2011, defendant TAPIA and an unindicted co-conspirator met with CI-2 at a hotel in Camarillo, California, and defendant TAPIA sold CI-2 a Norinco, SKS assault rifle, a

7

Bushmaster, AR-15 assault rifle, and ammunition for a total of $2,000.

-     On June 8, 2011, defendant TAPIA gave CI-2 approximately 14.1 grams of cocaine.

-     On June 17, 2011, defendant TAPIA and CC-3 met at a hotel in Camarillo, California, and sold CI-2 an ITM Arms, model MK-99, assault rifle and ammunition for $3,000, and defendant TAPIA told CI-2 that he had just come from his (defendant TAPIA's) mother's house and that he had an additional gun he could potentially sell to CI-2.

-     On June 17, 2011, defendant TAPIA, assisted by CC-3, sold CI-2 approximately 27.6 grams of methamphetamine in exchange for $1,000 and provided CI-2 with approximately .19 grams of heroin as a sample, which narcotics had been secreted in the hidden compartment in defendant TAPIA's Honda.

-     n June 22, 2011, CC-3 possessed on the passenger seat of defendant TAPIA's Honda three bindles of methamphetamine, paperwork belonging to defendants CC-3 and TAPIA, and pay/owe sheets.  In addition, defendant TAPIA and CC-3 further possessed in the hidden compartment of defendant TAPIA's Honda the following items: approximately 234 grams of methamphetamine; 1.13 kilograms of heroin; 532 grams of cocaine; a loaded Taurus .38 caliber revolver; a loaded Smith & Wesson 9mm handgun; two Smith & Wesson 9mm law-enforcement-only, high-capacity magazines; 50 rounds of .45 caliber ammunition; 51 rounds of .357 caliber ammunition; 35 rounds of .380 caliber ammunition; five rounds of .38 caliber ammunition; one shotgun shell; six rounds of 9mm ammunition; and $10,020 in cash..

-     On July 19, 2011, defendant TAPIA and CC-3 and CC-4 met CI-2 in a hotel room and sold CI-2 ammunition and the following three handguns: (a) a Glock, model 17, 9mm caliber handgun; (b) a Ruger, Security model, .357 caliber handgun; and (c) a Daewoo, model DP51C, 9mm caliber handgun.

-     On August 4, 2011, CC-2 obtained approximately one pound of methamphetamine, which was packaged in a clear plastic Rubbermaid container with a red lid, from defendant TAPIA's Stash House.

-     On August 25, 2011, defendant TAPIA and CC-5, and an unindicted co-conspirator, met with CI-2 in a hotel and sold CI-2 ammunition and the following three handguns for $1,400: (a) a Smith & Wesson, model 586, .357 caliber handgun; (b) a Ruger, Security Six model, .357 caliber handgun; and (c) a Harrison & Richards, model 999, .22 caliber handgun.

-     On September 8, 2011, defendant TAPIA, during a meeting in a hotel room, sold CI-2 ammunition and the following three handguns for $1,300: (a) a Ruger, model SP101, .38 caliber

handgun; (b) a Sig Sauer, model P229, .40 caliber handgun; and (c) a Bryco Arms, model 38, .380 caliber handgun.

- On September 16, 2011, defendant TAPIA and CC-1, in a hotel room in Las Vegas, Nevada, met with CI-2 and a person defendant TAPIA and co-defendant PANCHO believed was the crime boss of CI-2 but who was, in fact, an undercover FBI agent (the "UC"), in order to negotiate the sale of ten pounds of methamphetamine and four kilograms of cocaine in exchange for $200,000.

- On September 16, 2011, defendant TAPIA and CC-1 attended a dinner with the UC and CI-2 in order to further discuss their illegal business relationship, and during this dinner, defendant and PANCHO stated that they could sell larger quantities than the ten pounds of methamphetamine and four kilograms of cocaine they had previously agreed to supply to the UC and CI-2 and that they were ready to deliver the ten pounds of methamphetamine the next day.

- On October 19, 2011, defendant TAPIA, during a meeting in a hotel room, sold CI-2 a fully automatic AK-47 assault rifle, a Taurus, 38 Special model, .38 caliber handgun, and ammunition for $1,900.

- On October 25, 2011, defendant TAPIA and CC-3 distributed ten pounds of methamphetamine to CI-2 to partially consummate the deal previously negotiated in Las Vegas.

- On October 25, 2011, defendant TAPIA and CC-3, in a hidden compartment inside defendant TAPIA's Prelude, possessed approximately 310 grams of a mixture and substance containing a detectable amount of methamphetamine and a loaded Mauser-Werke, .22 caliber handgun.

- On October 25, 2011, defendant TAPIA, at his parents' residence on West Hill Street in Oxnard, California, possessed an AK-47 assault rifle, a sawed-off shotgun, and approximately $10,000 in cash.

## SENTENCING FACTORS

13. Except as set forth in paragraph 3 above, defendant and the USAO have no agreement as to the appropriate sentence or the applicable Sentencing Guidelines factors. Except as set forth in paragraph 3, both parties reserve the right to seek any sentence within the statutory maximum and mandatory minimum, and to argue for any criminal history score and category, base offense level,

9

specific offense characteristics, adjustments, departures, and variances.

WAIVER OF CONSTITUTIONAL RIGHTS

14. Defendant understands that by pleading guilty, defendant gives up the following rights:

a) The right to persist in a plea of not guilty.

b) The right to a speedy and public trial by jury.

c) The right to the assistance of an attorney at trial, including the right to have the Court appoint an attorney to represent defendant at trial. Defendant understands, however, that, despite defendant's guilty plea, defendant retains the right to be represented by an attorney -- and, if necessary, to have the Court appoint an attorney if defendant cannot afford one -- at every other stage of the proceeding.

d) The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e) The right to confront and cross-examine witnesses against defendant.

f) The right to testify on defendant's own behalf and present evidence in opposition to the charges, including calling witnesses and subpoenaing those witnesses to testify.

g) The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h) Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, any

outstanding discovery, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION

15. Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.

LIMITED WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

16. Defendant agrees that, provided the Court imposes a total term of imprisonment of **25** years or less, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the court, provided it is within the statutory maximum; (d) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (e) any of the conditions of probation or supervised release imposed by the Court.

17. Defendant also gives up any right to bring a post-conviction collateral attack on the conviction or sentence, except a post-conviction collateral attack based on a claim of ineffective assistance of counsel, a claim of newly discovered evidence, or an explicitly retroactive change in the applicable Sentencing Guidelines

18. The USAO waives its right to appeal defendant's sentence, provided it is within the statutory minimum and maximum.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

19.  Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

## EFFECTIVE DATE OF AGREEMENT

20.  This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

## BREACH OF AGREEMENT

21.  Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this

12

agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing.  If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

22.  Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a) Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b) Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c) Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the

13

Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

COURT AND PROBATION OFFICE NOT PARTIES

23.  Defendant understands that the Court and the United States Probation Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

24.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations are not error, although each party agrees to maintain its view that the calculations above are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

25.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will

14

remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

26.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

<u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

27.  The parties agree that this agreement will be

considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF CALIFORNIA

ANDRÉ BIROTTE JR.
United States Attorney


_____                    _____
MACK E. JENKINS                                    Date
CAMERON L. SCHROEDER
Assistant United States Attorneys


_____                    _____
LUIS MANUEL TAPIA                                  Date
Defendant


_____                    _____
BRIAN A. NEWMAN                                         Date

Attorney for Defendant
Luis Manuel Tapia

16

CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms.  I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____        _____
LUIS MANUEL TAPIA                         Date
Defendant

17

CERTIFICATION OF DEFENDANT'S ATTORNEY

I am LUIS MANUEL TAPIA's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____        _____
BRIAN A. NEWMAN                                Date
Attorney for Defendant
Luis Manuel Tapia

18

EXHIBIT C

| From: | Jenkins, Mack (USACAC) |
|---|---|
| To: | mbednarski@kmbllaw.com |
| Cc: | Schroeder, Cameron (USACAC) |
| Subject: | US v. Tapia: Plea Offer |
| Date: | Thursday, March 20, 2014 7:31:37 PM |

Hello Marilyn – thanks for making the time to meet with Brandon, Cameron, and me on Friday.  As we have stated previously, we appreciate the time and efforts you have made in attempts to resolve this case.  We have considered (with Brandon, my Deputy Chief) your position and unfortunately do not feel a resolution as you have requested (or near it) is appropriate in this circumstance.   We will, however, agree to a time-sensitive, re-offer that has now been approved, while also confirmed as the best offer Tapia will get.  It is the same tentative offer we discussed with you most recently.

Plea Offer

- 15 Year Mandatory Minimum (846, 841(b)(1)(A) and 924(c) count);

- Parties' Stipulated Non-Binding Range: 18-22 years imprisonment (J. Wright would be free to sentence him anywhere from 15-Life);

- 360 Month Appeal Waiver (the low-end of the Guidelines range);

- Consent to Search, absent suspicion, while on supervised release;

- Dismissal of two 851 counts and all other counts and man mins.

Each of these are material terms to the offer.  Because time is of the essence for our respective schedules and because this is the same offer already presented to you and your client please have a tentative response by Monday 3/24 as to whether you would like us to draft up the plea offer in writing.  At that point the ultimate deadline to sign the plea offer would be COB on Friday 3/28, after which the government would begin preparing for trial in earnest, not extend any further plea offers, and object to any third-point reduction for acceptance.

Motions and Meet & Confer

     The motions deadline is 4/14 and we would like to persist in that date; and it appears you have been looking into some potential motions.  You have also mentioned something to the effect of your belief that discovery had not even started.  Presuming Tapia does not sign a plea agreement by next Friday, we would like to facilitate efficient motion practice and to resolve any resolve-able issues far in advance of trial.    Please let us know what dates would work for a meet and confer regarding motions, discovery, and any other trial issues you/we anticipate.

Talk to you soon.

**Mack E. Jenkins** | **Assistant United States Attorney**
**Public Corruption & Civil Rights Section**
United States Courthouse, Suite 1300 | 312 N. Spring St. | Los Angeles, California 90012
T: 213.894.2091| F: 213.894.6436 | mack.jenkins@usdoj.gov

# EXHIBIT D



# United States Department of Justice

## United States Attorney's Office
## Central District of California

*Mack E. Jenkins*
*Cameron L. Schroeder*
*Phone: (213) 894-2091/0596*
*E-mail: mack.jenkins@usdoj.gov*
    *cameron.schroeder@usdoj.gov*

*1300 United States Courthouse*
*312 North Spring Street*
*Los Angeles, California  90012*

May 9, 2014

**<u>VIA E-MAIL and U.S. MAIL</u>**

Marilyn E. Bednarksi, Esq.
234 East Colorado Boulevard Suite 230
Pasadena, CA 91101
E-mail: mbednarski@kmbllaw.com
Phone: (626) 844-7660

> Re:    <u>United States v. LUIS MANUEL TAPIA, et al.</u>
>         CR 11-1068-ODW

Dear Marilyn:

We have received your letter of April 11, 2014, in which you confirm you and your client have declined a plea offer that would have removed the multiple mandatory life sentences he currently faces if convicted at trial and replaced them with a mandatory minimum term of 15 years. In your response you note that this is owed to your concern that any plea must be binding because of your concern regarding "incite[able] judges." (4/11/14 Ltr. at 1.)

We have taken great care to provide you with multiple indexes for discovery, including a discovery matrix that notes and describes various items of discovery relevant to a particular charged event in this case, in chronological order. We believe this provides a very streamlined approach for preparing this case for trial, as the overwhelming majority of the government's case-in-chief will come from the specific items identified for you in that chart.

We also note that in your reply in support of your motion to suppress (CR 201) you tell the Court that your discovery letter, which included no requested response date[1] and was sent one business day prior to your deadline to file motions, was "apparently ignored by the government." (Reply at 1.) As you know, this is untrue. We specifically responded to your discovery letter, which was sent at 5:34 p.m. on that Friday, the next business day, on April 14,

---

[1] With the exception that you requested grand jury transcripts by May 15, or six days from the date of this responsive letter. (4/11/14 Ltr. at 7.)

May 9, 2014
Page 2

2014 and again on April 16, 2014.  Moreover, we produced to you additional (non-informant related) discovery on April 25, 2014 and April 28, 2014.

As noted in our communications to you on April 14 and 16, now that we have prepared our responses to your motions and had the opportunity to travel to Oxnard to meet with the agents/officers in response to your numerous requests, we enumerate our specific responses to each below.

0.[2]    We have provided or will provide[3] all of the recordings of your client that (a) are relevant and (b) are in the custody or control of the "prosecution team" (here, the USAO and the FBI-OPD Task Force (the "Task Force")).   We do not have custody or control over recordings, for example, at state facilities, or that may be in the possession of other investigating agencies who were not part of the Task Force but who may have previously investigated your client, such as the Ventura County Sheriff's Office.[4]  Because your client was such a significant law enforcement target for a number of years, it is possible other recordings are possessed by other law enforcement agencies.  To the extent you are able to identify any particular agency in possession of such recording we can attempt to facilitate your obtaining such a recording, but because we do not control other agencies outside of the prosecution team, such disclosure would be at the discretion of the other entity.  In any event, we are unaware of the existence of any other such recordings.  We would note that the Metropolitan Detention Center – Los Angeles ("MDC-LA") is also not part of the prosecution team and must be subpoenaed directly for recordings.  That said, in order to facilitate your trial preparation, on April 22, 2014, we requested from MDC-LA, on your behalf, all TRULINCS (non-privileged email) communications attributed to your client, and on April 24, 2014, we subpoenaed all of his non-privileged MDC-LA calls.  We are enclosing in our response MDC-LA recorded phone calls of your client from 10/26/2011 - 4/24/2014, which the undersigned received yesterday, and e-mails from 8/28/13 - 4/22/14, which we received today.

We have inquired of the prosecution team in the matter charging various Mexican Mafia brothers, including Michael Moreno, in United States v. Jose Rodriguez-Landa, 13-CR-00484-CAS, and they have not provided us any recordings/writings of your client.  We can confirm that we will not be using any of their evidence in the instant trial.

---

[2] For ease of reference, we have included our response to your first series of requests as item number "0."

[3] We believe we have provided all of the recordings pertinent to the charged transactions, but have asked the agents to double-check the recorded material for any other potentially relevant statements by your client.  We will produce any additional material as soon as we receive and process it.

[4] The exception being the state wiretap against your client, which was provided by the VCSO to the Task Force and previously provided to you.

May 9, 2014
Page 3

1.      It should come as no surprise that we will not agree to provide true names for any confidential sources used in this investigation that will not testify in the government's case-in-chief.  No such individuals are currently expected to testify, and therefore no Giglio information is implicated either.[5]  Moreover, because of your client's leadership position in a violent criminal street gang; his connections to the Mexican Mafia; his recorded conversations bragging about killing individuals with his heroin; his recorded conversations desiring to eliminate a business partner who had wronged him; and the plethora of high-powered weapons that were at your client's disposal, unnecessarily disclosing the identify of non-testifying cooperating witnesses would be ethically reckless and dangerous.

2.      We will not provide information regarding the specifics of the death of one of the sources in this case, except to confirm that he died in January of 2012.  As we previously informed you, when you indicated that his death "was karma," the decedent passed away after a longstanding battle with cancer that reoccurred and metastasized after the conclusion of this investigation.  The specifics of his passing have no bearing on this case.

3.      As stated above, we will not provide the true name of any informant.  And, of course, in no circumstance would we volunteer the address of any informants, even if we did intend to call any at trial.  But, again, we do not expect to call any such person to testify in this matter.  As for other prosecution witnesses, pursuant to the Court's standing order, we will file a witness list with the Court one week in advance of trial.  In return, we request the defendant's witness list be provided on the first day of trial.  We will not provide you contact information or addresses of any civilian witnesses.  We will, however, follow our standard practice of informing any civilian witness of your desire to speak with them and provide them your contact information should they desire to do so.

4.      As stated above, we currently do not anticipate calling any confidential informants at trial; should this change, we will promptly advise you.

5.      We will produce any prior conviction records or other Giglio material for any witness reasonably in advance of trial.  At this point, we know of no witnesses for whom this would be relevant.

6.      We will not agree to provide information regarding any prior or pending cases in which any source used in this case has been involved.  Such information is not implicated by Rule 16, Brady, Giglio, or the Jencks Act, and you have not established why it would be relevant or discoverable in this case.

7.      As stated above, we will provide any Giglio material for any prosecution witness reasonably in advance of trial.  At this time, we are not aware of any such information.  We believe our standing Giglio responsibilities reflect our obligations as implicated by your request.

---

[5] Should this decision change, we will provide you with any Giglio material reasonably in advance of the particular informant's testimony.

May 9, 2014
Page 4

8.      As stated above, we will provide any <u>Giglio</u> material for any prosecution witness reasonably in advance of trial.  At this time, we are not aware of any such information.  We believe our standing <u>Giglio</u> responsibilities reflect our obligations as implicated by your request.

9.      The government is not aware of any potential prosecution witness or other person who was given a polygraph examination during the investigation of your client leading to the charges in this case.

10.      As indicated above, the government does not believe that the specifics of the death of one of the confidential sources in this case after a longstanding battle with cancer are relevant to this matter.  As you are aware, almost all of the interactions with your client forming the charged conduct in this case were recorded, including many on video, and there is no evidence to indicate any mental or behavioral condition of the confidential source that would be pertinent to those interactions or the charges in this case.  Accordingly, we will not agree to seek medical records for this individual, nor provide information regarding his next of kin, out of respect for their privacy and to protect his identity and that of his family.

11.      The government will produce handwritten notes of any agent in this matter consistent with its discovery obligations.  We are still determining whether any such notes exist.  We will also provide handwritten notes of any relevant oral statement of defendant in response to interrogation by any person the defendant knew was a government agent, pursuant to Rules 16(a)(1)(A) and 16(a)(1)(b)(ii), that is in our custody or control.  At this time, we are not aware of any such documents.

12.      We will request from any relevant federal agency a review of the personnel file of any witness employed by the U.S. government.  As for OPD officers, we have arranged to follow the same procedure through which we review LAPD personnel files.  That is, the government will personally review personnel files of local officer witnesses for responsive material and provide pertinent information to you or to the Court.  Responsive material will mean material consistent with a <u>Henthorn</u> review, that is, sustained findings of adverse credibility determinations, bias, or moral turpitude.  We have already performed such a review for any officer we currently expect to testify, including the government's declarants filed in support of its opposition to your motion to suppress, and will conduct additional review for any officers we later determine we may call at trial.  At this time, there is no responsive material.

13.      The government is conscious of, and will comply with, its obligations to provide <u>Giglio</u>/impeachment information for any testifying witness.  We will not agree to provide such information for <u>non</u>-testifying individuals, as <u>Giglio</u> is triggered by defendant's rights at trial.  As noted above, because no confidential informant is expected to testify in this matter, these obligations are not triggered, and the information is not in issue.  Because all of the charges in this case are based on recorded interactions – not informant testimony – the credibility of non-testifying individuals and the concerns you cite in your letter are not implicated in this matter.  The government has previously produced all reports pertinent to this case, and will produce any agent notes consistent with its Rule 16, <u>Brady</u>, <u>Giglio</u>, and Jencks obligations.  In addition, although not required, we will agree to provide payment information for the use of the

May 9, 2014
Page 5

informants in this case.  We have made this request of the FBI and are awaiting responsive information.

13.2[6] Your client is aware of any gifts made to him by any informant in this case, and certainly you are free to cross-examine any pertinent witness on this issue at trial.  These "gifts" include a necklace <u>requested by your client</u> (which we believe was worth no more than a few hundred dollars, at most, and in exchange for which your client provided cocaine), and a turkey/rooster foot (which was of negligible monetary value).  The government is not aware of any law enforcement policies relating to such gift-giving, and does not believe that any such policy would be relevant in this matter in any event.

14.     No currently anticipated prosecution witness testified before the grand jury; should that change, we will of course produce any statements consistent with our Jencks obligations.  As noted in our opposition to your motion for disclosure of grand jury transcripts (CR 200), you have identified no other valid grounds for disclosure.

15.     The government has produced the test results for all of the controlled substances seized in this matter, as well as analyses of interstate travel of firearms.  Given the quantities and types of drugs at issue in this case, which are not close to any statutory or guideline thresholds, we do not believe this is a case in which the margins of any laboratory testing would be at issue.  Indeed, we presume the Court would prefer admission of such routine evidence by stipulation and thus would like to discuss the viability of your client's agreement to such a document Therefore, we do not believe that lab notes or other materials regarding the underlying analyses of the controlled substances are at issue, or relevant in this matter.  However, if you can demonstrate some reason to believe that there is a problem with any of the testing done in this matter, we are of course open to further discussion.  We cannot provide access to the laboratory devices used to perform this testing, as they are extremely rigorously calibrated and lab access is limited to authorized persons only; we do not have the authority to override those restrictions.  If you believe that any of the substances needs to be re-tested by an independent examiner, we can of course accommodate such a request, though we would ask that you let us know as soon as possible, as such transfer of evidence custody and testing takes some time.

16.     The firearms seized in this case are in the custody of the Oxnard Police Department.  The controlled substances are in the custody of the FBI, at their Westwood location.

17.     We are not aware of any pertinent toll records obtained in this matter.  We have asked the agents to double-check, and will produce anything pertinent that is located.

---

[6] There are two paragraphs numbered 13 in your letter.

May 9, 2014
Page 6

## SUPPLEMENTAL DISCOVERY

As part of our response to your letter and consistent with our discovery obligations, we include the following disc of bate-stamped discovery, pursuant to the same terms as our initial production in this matter:

- (1) File folder containing LT 000865-000867: General Discovery which includes both Seizure Photos (previously produced by e-mail) and the face sheet for the Arrest Report for DIANA MARIA ZAMORA dated 06/21/11.

- (2) File folder containing ONLY DEF 003522-003966: Defendant Only Discovery specific to LUIS MANUEL TAPIA which includes Inmate History, Inmate Discipline Data, Commissary Transactions, MDC calls dated 10/26/11 - 04/31/14, MDC Phone List and E-mails dated 08/28/13-04/22/14.

Please let us know if you would like to further discuss any of the matters raised above.

Very truly yours,
ANDRÉ BIROTTE JR.
United States Attorney


/s/
MACK E. JENKINS
CAMERON L. SCHROEDER
Assistant United States Attorneys

Encl: Discovery sent by U.S. Mail only